In the Matter of LEMCO
GYPSUM, INC., Debtor.

ALLIED EASTERN STATES MAINTE-
NANCE CORPORATION; Chatham
County, Georgia; and Combustion En-
gineering, Inc., Plaintiffs,

v.

L.E. MILLER, Jr.; L.E. Miller, III;
Frank B. Miller; Randall B. Miller;
and Robert N. Miller, Defendants.

Bankruptcy No. 486–00839.
Adv. No. 488–0045.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Dec. 23, 1988.

Morton G. Forbes, Savannah, Ga. for Allied Eastern States Maintenance Corp.

Wade W. Herring, II, Savannah, Ga., for Combustion Engineering, Inc.

Charles W. Barrow, Michael K. Dennard, Savannah, Ga., for Chatham County, Ga.

Mark Bulovic, Savannah, Ga., for defendants.

## MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Chief Judge.

Before the Court is the request of creditors Allied Eastern States Maintenance Corporation, Chatham County, Georgia, and Combustion Engineering, Inc., (the "Creditors") as well as the Chapter 7 Trustee, James L. Drake, Jr., to subordinate the claim filed jointly by L.E. Miller, Jr., L.E. Miller, III, Frank B. Miller, and Robert N. Miller (the "Millers").

The Creditors filed an adversary proceeding against the Millers pursuant to 28 U.S.C. Sections 47 and 1334, 11 U.S.C. Section 510(c), and Bankruptcy Rule 7001. As admitted by the Millers, this is a core proceeding. The Court finds and concludes that it has jurisdiction to hear and decide this matter.

The matter was tried on August 2, 1988. Upon motion of Combustion Engineering, Inc., joined by the other Creditors and with the consent of the Trustee, the Trustee was added as a party-plaintiff. The Court denied the Millers' motion to dismiss the Creditors because of an alleged lack of standing to bring an adversary proceeding for equitable subordination. The Millers were properly served at a place where they regularly conduct their business. B.R. 7004(b)(1).

At trial, L.E. Miller, Jr., and Frank B. Miller testified for both the Creditors and the Millers. No other witnesses testified. Certain documentary evidence was adduced, including the bond documents that are the foundation of the largest part of the Millers' claim. Counsel were allowed ample opportunity for oral argument. Additionally, the parties filed post-hearing briefs for the Court's consideration.

Based upon the testimony of the witnesses, the other evidence adduced at trial, and the oral and written arguments of counsel, the Court enters its Findings of Fact and Conclusions of Law. B.R. 7052.

## FINDINGS OF FACT

### A. The Beginning

1) The Millers were the founders, directors, officers and shareholders of Lemco Gypsum, Inc., ("Lemco"), the debtor corporation. Lemco was a Georgia corporation, located in Savannah, Georgia. L.E. Miller, Jr., was president of Lemco. A son, L.E. Miller, III, was vice president. Another son, Frank B. Miller, served as secretary and treasurer. Frank B. Miller, in consultation with his father, was primarily responsible for Lemco's daily operations.

2) The Millers created Lemco to manufacture gypsum briquettes from gypsum by-product produced by and purchased from American Cyanamid, now Kemira, Inc.

3) The Millers purchased Lemco stock to provide it with an initial capitalization of $200,000.00.

### B. The Bonds

4) The Savannah Port Authority on January 1, 1980, authorized the issuance and sale of $3,000,000 of Industrial Revenue Bonds (the "bonds"), the proceeds of which were loaned to Lemco and used to finance the cost of the acquisition, construction, and installation of Lemco's facility to manufacture gypsum briquettes. The Citizens and Southern National Bank ("C & S")

acted as trustee. The Prudential Insurance Company of America ("Prudential") purchased the bonds.

5) As security for payment of the bonds, the Millers, acting in their individual capacities, entered into a Guaranty and Indemnification Agreement ("guaranty"), dated January 1, 1980. The guaranty provided in part:

> "This guaranty is a primary and original obligation of each of the Guarantors, jointly and severally, and is an absolute, unconditional, continuing and irrevocable guaranty of payment and not of collectibility or performance and is in no way conditioned or contingent upon any attempt to collect from the Issuer or to realize upon any of the property subject to the Indenture."

(Exhibit P–1–B, ¶ 1).

6) To secure their obligations under the guaranty, the Millers, acting in their individual capacities, entered into a Pledge Agreement with C & S, also on January 1, 1980. (Exhibit P–1–C).

7) Lemco and the Millers defaulted on the bonds. In September of 1982, C & S instituted an action in the Superior Court of Chatham County, Georgia, against the Millers in their individual capacities. Less than two months later, C & S obtained a default judgment against the Millers. A consent order was entered on December 30, 1982, arranging for certain assets of the Millers to be paid toward satisfying the judgment. C & S and Prudential also consented to a forbearance agreement with the Millers, but the Millers also defaulted on that agreement. Ultimately, the Millers satisfied the judgment against them for the remaining balance of $1,369,890.72. By letter dated October 30, 1985, Prudential acknowledged that C & S had received all amounts due in satisfaction of the judgment. (Exhibit P–1–A).

8) The largest part of the Millers' claim against Lemco is based upon their satisfaction of the judgment against them. The Millers claim to be secured creditors in the amount of $1,369,890.72, asserting that they are subrogated to the rights of Prudential.

## C. The Loans

9) The Millers, acting in their individual capacities, signed notes and advanced Lemco funds. Robert N. Miller, Frank B. Miller, L.E. Miller, III, and Randall B. Miller each advanced Lemco $48,000.00. L.E. Miller, Jr., advanced $208,000.00. The notes are all dated May 15, 1980. (Exhibit P–1–F).

## D. The Omni–Lift, Inc., Judgment

10) Lemco purchased conveyor belt systems from a company called Omni–Lift, Inc. Subsequently, L.E. Miller, Jr., and Frank B. Miller signed a promissory note and security agreement with Omni–Lift to forestall legal action against them and to allow Lemco an opportunity to seek more financing. Lemco and Frank B. and L.E. Miller, Jr., did not pay the note. Omni–Lift sued them and eventually obtained a judgment. Principal, interest, and attorney's fees totaled $131,945.51.

11) On October 10, 1986, Frank B. Miller and L.E. Miller, Jr., paid Omni–Lift $30,000.00 to settle the judgment against them and took an assignment of the total judgment against Lemco. This assignment of $131,945.51 comprises part of the Millers' claim against Lemco and is the basis of their claim as judgment creditors.

## E. The Business

12) Lemco did not begin start-up procedures until late in 1983.

13) Under the Millers' control, what operations Lemco had were begun only after repeated delays and then continued only intermittently.

14) By 1985, Lemco's operations had ceased.

15) Under the Millers' control, Lemco never operated profitably. Lemco lost between 1.3 and 1.8 million dollars in 1983. Lemco lost approximately 1.4 million dollars in 1984.

16) Meanwhile, Frank B. Miller's salary was increased from $14,000.00 annually to $25,000.00 annually.

17) As the Millers admitted in their answer, under their control, Lemco leased equipment from L.E. Miller, Jr. Lemco also had dealings with other entities controlled by the Millers.

18) As Frank B. Miller testified at trial, Lemco continuously delayed paying outside creditors with promises of new financing and increased productivity, but Lemco did not pay outside creditors, including the Creditors in this action.

19) The Millers closed Lemco's doors for business on December 31, 1985.

20) The Millers put Lemco in bankruptcy on October 3, 1986.

## CONCLUSIONS OF LAW

This Court is a court of equity. *In the Matter of Mobile Steel Co.*, 563 F.2d 692, 699 (5th Cir.1977). The Court has the authority to subordinate claims on equitable grounds. *Matter of Multiponics*, 622 F.2d 709, 713 (5th Cir.1980) 11 U.S.C. § 510(c) held that:

"... after notice and a hearing the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate."

Subordination is subject to a three-part test: (a) The claimant must have engaged in some type of inequitable conduct; (b) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (c) equitable subordination must not be inconsistent with the provisions of the Bankruptcy Act. The inequitable conduct which must be shown need not necessarily be related to the acquisition or assertion of the claim. *Id.*

[3] The initial burden of proof is on the party objecting to a validly filed proof of claim to come forward with enough substantiated proof of unfairness to overcome the *prima facie* validity of proof of claim. *Multiponics*, at 714. Also see: Bankruptcy Rules 3001(f) and 3007. "Where the claimant is an insider or fiduciary, the [objecting party] bears the burden of presenting material evidence of unfair conduct. Once the [objecting party] meets [its] burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated. If the claimant is not an insider or fiduciary, however, the [objecting party] must prove more egregious conduct such as fraud, spoilation or overreaching, and prove it with particularity." *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir., 1986) (citations omitted).

Although the Millers "need not overprove [their] good faith and fairness at the mere cry of inequity by [an objecting party]", *Multiponics*, at 714, they must do so where the objecting party has sufficiently carried its burden of coming forward, with substantial proof of unfairness.

In meeting the first prong of the equitable subordination test, the objecting party must come forward with substantial proof that the claimant engaged in some type of inequitable conduct. *"The inequity which will* entitle the bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not ... be specifically related to the creditor's claim, either in its origin or in its acquisition, but it may equally arise out of *any unfair act* on the part of the creditor, *which affects the bankruptcy results to other creditors and so makes it inequitable that he should .assert a parity with them in the distribution of the estate."* *Mobile Steel, supra* at 700 (emphasis original), quoting *In re Kansas City Journal–Post Company*, 144 F.2d 791, 803–04 (8th Cir.1944). "The courts have recognized three general categories of conduct considered sufficient to warrant equitable subordination: (1) fraud, illegallity, breach of fiduciary duty; (2) under capitilization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Matter of Missionary Baptist Foundation*

*of America,* 712 F.2d 206, 212 (5th Cir. 1983).

As the founders, directors, officers and shareholders of Lemco, the Millers were corporate insiders and fiduciaries.[1] "A fiduciary, under general corporate theory, includes an officer, director, agent, majority shareholder or a minority shareholder exercising actual control over the corporation". *N & D Properties,* at 731. As an insider and fiduciary the Millers dealings with the debtor/corporation "special scrutiny must be given to their dealings with the debtor. "The bankruptcy court has the equitable power and duty 'to sift the circumstances surrounding any claim, to see that injustice or unfairness is not done in administration of the bankrupt estate' ... This duty is 'especially clear' when the claim would accrue to the benefit of an officer, director or stockholder ... While the mere 'opportunity to do wrong' is not proscribed, the 'unconscionable use' of such an insider opportunity may suffice to deprive the wrongdoer of the fruits of his wrong ... The presence or absence of the 'earmarks of an arm's length bargain' may be significant, and the conduct of a small number of directors may be subject to even greater scrutiny for indicia of fair dealing and candor." *Multiponics,* at 714 (citations omitted). See also *In re Purco,* 76 B.R. 523, 530–31 (Bankr.W.D.Pa.1987) ["If he should be ... one of a small number vested with certain powers, this obligation will still be stronger, and his act subject to more severe scrutiny, and their validity determined by more rigorous principals of morality, and freedom from motives of selfishness." Quoting, *Twin Lick Oil Company v. Marbury,* 91 U.S. (1 Otto) 587, 590, 23 L.Ed. 328 (1896).] The actions of the Millers demand especially strict scrutiny.

■ The transaction between the Millers and Prudential was by no means illegal. However, as insiders their activities and the claim they assert in this case must be subjected to special scrutiny and may be subordinated if equitable grounds exist.

■ As to the transactions surrounding the purchase of the bonds, the Plaintiffs contend that they have carried their burden because in looking to the post-default transaction, with scrutiny being given to the manner in which it was structured and by whom, it is clear that the Millers engaged in unfair conduct so as to confer an unfair advantage on them. To illustrate, consider the contrasting results of the transaction they structured with the result in the absence of their so acting:

Lemco and the Millers were jointly and severally liable to pay off the bonds held by Prudential. The bonds were secured by all or substantially all of the assets of Lemco. On default, the Millers paid $1,369,890.72 which they were already legally obligated to pay, took possession of the bonds and now assert a *secured* claim in this case for the full $1,369,-890.72.

Had the Millers not taken such action, Prudential would have had recourse to foreclose upon and sell all the pledged assets to liquidate all or part of the bonded indebtedness. If the assets were insufficient to satisfy their debt, Prudential had the right to sue the Millers on their joint and several liability and collect the deficiency in full. The Millers would then have an *unsecured* claim in an amount less than $1,369,890.72 for contribution from their co-maker, Lemco. Depending on the success of Prudential in liquidating those assets, the amount which the Millers had to pay might have been far less than $1.3 million and would in any event have been unsecured.

Taking into due consideration the fact that the debtor/corporation was insolvent [2]

---

**1.** *11 U.S.C. Section 101(30) provides in relevant part that:* "'insider' includes—
 (B) *if the debtor is a corporation—*
 (i) *director of the debtor;*
 (ii) *officer of the debtor;*
 (iii) *person in control of the debtor;*
 (iv) *partnership in which the debtor is a general partner;*

 (v) *general partner of the debtor;* or
 (vi) *relative of a general partner, director, officer, or person in control of the debtor;"*

**2.** The debtor/corporation began its startup procedures in late 1983. Operations were begun only after repeated delays and then continued only intermittently. Under the Millers' control,

during the period in which the Millers structured the Prudential transaction, support for the Plaintiffs' position is found in *In re Kansas City Journal–Post Company*, 144 F.2d 791 (8th Cir.1944). The court stated that: "It would seem that an improper use or appropriation of corporate assets by a fiduciary, which has occurred in reasonable proximity to the bankruptcy and while the corporation is insolvent, so that the bankruptcy results are directly affected by it, may consistute such inequity against other creditors as to entitle the court to deal with it by appropriate and measured subordination of any claim asserted by the fiduciary of the estate ...". *Id.* at 804. Clearly, the choice of structuring the Prudential transaction was the Millers', made while the debtor/corporation was insolvent and occurred in reasonable proximity to the October 3, 1986 filing of the Debtor's petition. Moreover, the Millers' actions directly affected the distribution in bankruptcy by elevating what would have been a smaller, unsecured claim into a larger secured claim. This would result in substantial detriment to other unsecured creditors in the case. The Millers' selection of this method of satisfying the Prudential claim conferred an unfair advantage on them as insiders by providing them with at least an arguably secured claim to recoup money they themselves owed as guarantors whose obligations to C & S Bank under the guarantee and indemnification agreement were primary and original, absolute, unconditional, continuing and irrevocable.

The conduct was inequitable in that they could have chosen to divert the same resources which were used to pay the debt to better capitalize Lemco and give it the cash needed to keep the bonds from going into default in the first place. While I am unable to conclude that Lemco was undercapitilized at the outset as proof of inequitable conduct, the Millers decision not to provide additional equity funds in time to prevent default, followed by the use of those same funds to acquire a secured position later is, in the context of this insider transaction, inequitable.[3] Their conduct is particularly egregious in light of the fact that the Millers had knowledge of the Debtor's insolvency, took no steps to prevent imminent collapse of the business while having the means to do so and instead made every effort to encumber the assets of the estate and obtain a priority in the impending bankruptcy.

Finally, given the facts, equitable subordination of this claim is not inconsistent with the provisions of Title 11. As a court of equity, the bankruptcy court is "authorized to prevent courses of conduct otherwise fraudulent, abusive or unfair ... the equitable powers of the bankruptcy court 'have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done ... the Courts will be guided by cardinal principals of equity ju-

---

Lemco never operated profitably. Lemco lost between 1.3 and 1.8 million dollars in 1983 and lost approximately 1.4 million dollars in 1984. By 1985, Lemco's operations had ceased. The structuring of the settlement and satisfaction of the default judgment against the Millers took place during this period of insolvency and was not satisfied in full until October 30, 1985.

**3.** The inequity of the Millers' conduct is further highlighted by their transactions with respect to the debtor/corporation and its creditors which occurred after the bankruptcy was filed. On October 22, 1987, the Trustee auctioned off certain assets of the Debtor which were located on the property of its landlord, Kemira, Inc. Mr. Miller personally made the high bid of $231,-000.00 for the subject property and subsequently had another family-owned company take title to the assets. Mr. Miller made the $231,000.00 bid in full knowledge of his "secured" position with respect to the assets in question and with the apparent intention that any dollars which he paid over to the Trustee for the equipment would in turn be paid to him because of his "secured" position. In effect, no monies would be paid into the estate which would be available for distribution to any other creditors, and moreover, the assets necessary to generate a distribution to creditors in the case would be removed from the reach of the bankruptcy estate and returned to the Millers. The cumulative effect of the Millers' conduct would be to elevate them to a secured status by which they would be made whole to the extent of the value of the assets of the estate, while at the same time depriving unsecured creditors of their pro rata share.

risprudence to the end that injustice or unfairness is not done in the administration of the bankrupt estate' ... particularly where a holistic picture of inequitable dealing is present, equitable subordination serves a useful function in bankruptcy administration." *Multiponics,* at 721. (Citations omitted).

The objecting parties having met their burden of coming forward with enough substantial proof of unfairness to overcome the *prima facie* validity of the Millers' proof of claim, the burden now shifts to the Millers to prove the fairness of their transactions with the Debtor. *N & D Properties,* at 731. "[T]he dealings of fiduciaries with their corporation 'are subjected to rigorous scrutiny and *where any of their contracts or engagements is challenged* the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.'" *Mobile Steel Company,* at 701, (emphasis original), quoting *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). The Millers essentially argue that they acted in good faith in satisfying the default judgment and merely stepped into the shoes of Prudential as a secured creditor of the Debtor. Considering that the Millers had knowledge of the Debtor's insolvency, were equity shareholders of the Debtor as well as the founders, directors and officers of the Debtor, had the means at their disposal to stop the Debtor's financial distress, but chose to do nothing except improve their position in an attempt to obtain a priority in the impending bankruptcy proceedings, it cannot be said that their conduct is inherently fair from the viewpoint of the corporation or those creditors interested therein. The Millers acted in their own best interest to salvage whatever monies they had invested in the corporation by attempting to elevate themselves to a secured position. They abandoned their fiduciary duty to the corporation and its creditors. Taking into account the holistic picture of the Millers' inequitable conduct, equitable subordination is demanded in this case.

Subordination of the entire claim to a junior position behind all other creditors is not necessarily justifiable, however. "[A] claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Mobile Steel Company,* at 701. The Millers claim relating to the bond will be classified as unsecured and will be subordinated to all other unsecured claims insofar as distribution is made to them on account of assets administered by the Trustee which were part of the collateral which secured the bonds. To the extent, however, that other assets are administered by the Trustee, this portion of the Millers claim shall rank with other unsecured claims for purposes of distribution.

█ Similarly, with respect to the Omni–Lift judgment, L.E. Miller, Jr., and Frank Miller had a joint and several obligation with Lemco to pay the promissory note in question. Omni–Lift obtained judgment against all three obligors. The judgment made Omni–Lift a secured creditor to the extent of any unencumbered property of all three defendants. The payment by the Millers of $30,000.00 operated to release their obligation to Omni–Lift. However, at the date this case was filed, Lemco owed Omni–Lift and not the Millers. All three codefendants had contingent claims for contribution to the extent they paid the judgment. *Horton v. Continental Casualty Co.,* 72 Ga.App. 594, 34 S.E.2d 605 (1945) (Right of contribution extends equally to actions ex contractu and actions ex delicto, where all are equally bound to bear the common burden, and one has paid more than his share.) Although they took an assignment of the entire judgment of $131,-945.51 it would be inequitable and would confer an unfair advantage to allow their claim in excess of $30,000.00 on an equal footing with other judgment claims. Accordingly, the claim of L.E. Miller, Jr., and Frank Miller arising out of this judgment is subordinated to all other unsecured claims to the extent of $101,945.51. From the evidence before me, none of the other Mil-

ler claimants have any claim for this portion of the debt.

The Millers attempted to confer an unfair advantage upon themselves as secured and judgment creditors. See, *e.g., Multiponics, supra* at 721 n. 11. If insiders can manipulate their corporation for their own purposes and yet retain the advantage of separate status in a subordination proceeding, the equitable powers of a bankruptcy court can be thwarted. *Matter of Multiponics,* 436 F.Supp. 1065, 1072 (E.D.La. 1977), *aff'd in part, rev'd in part on other grounds,* 622 F.2d 709 (5th Cir.1980). Moreover, in light of the total circumstances presented; see, *e.g., Multiponics,* 622 F.2d at 721; *In re Beverages International Ltd.,* 50 B.R. 273, 283 (Bankr.Mass. 1985); the Court must conclude that the Millers were Lemco's decision-makers and that many decisions inured to their benefit and to the detriment of Lemco and its creditors. *DeMet v. Harralson (Matter of Sky Bowl, Inc.),* 399 F.2d 35, 39 (5th Cir. 1968).

This subordination is in harmony with the Bankruptcy Act, providing for equality of distribution consistent with principles of equity and fairness. *Multiponics,* 622 F.2d at 721.

 The Court declines to subordinate that portion of the Millers' claim based upon their initial loans to Lemco, that is, the $400,000.00 evidenced by notes.[4] The law does not follow the "rule that claims advanced by fiduciaries are invalid simply because of the nature of the relation existing between the claimant and the bankrupt." *Mobile Steel,* 563 F.2d at 701. The law does not wish to discourage those most interested in helping a corporation. *Id.* Moreover, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Id.*

---

4. Part of the Millers' claim against Lemco is based upon the Millers' loans to Lemco. The amount stated on the proof of claim form is $832,000.00. At trial, however, the Millers could only substantiate $400,000.00, as described herein. Although the Court indicated it

ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Millers file an amended proof of claim consistent with the terms of this Order. Their claims as subordinated herein are allowed and granted the priority status set forth in this Order.

would be open to a proffer from the Millers as to the additional amount, no proffer has been forthcoming. Accordingly, the Millers' claim based upon their loans to the corporation is deemed to be $400,000.00 and is unsecured.