911 F.2d 1553
 232 Collier Bankr.Cas.2d 1166, Bankr. L. Rep. P 73,629
In the Matter of LEMCO GYPSUM, INC., Debtor.
ALLIED EASTERN STATES MAINTENANCE CORPORATION; Chatham
County, Georgia; and Combustion Engineering,
Inc., Plaintiffs-Appellees,
v.
L.E. MILLER, Jr.; L.E. Miller, III, Frank B. Miller;
Randall B. Miller and Robert N. Miller,
Defendants-Appellants.
 No. 89-8706.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 18, 1990.
 
 Mark Bulovic, G. James McCallar, Jr., McCallar & Associates, Savannah, Ga., for defendants-appellants.
 Morton G. Forbes, John A. Foster, Ranitz, Mahoney, Forbes & Coolidge, Savannah, Ga., for plaintiff-appellee Allied Eastern States Maintenance Corp.
 Wade W. Herring, II, Hunter, Maclean, Exley & Dunn, Savannah, Ga., for plaintiff-appellee Combustion Engineering, Inc.
 Edward T. Brennan, Chatham County Atty., Savannah, Ga., for plaintiff-appellee Chatham County, Ga.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before CLARK, Circuit Judge, MORGAN and RONEY*, Senior Circuit Judges.
 RONEY, Senior Circuit Judge:
 
 
 1
 L.E. Miller, Jr. and his four sons appeal the district court's affirmance of the bankruptcy judge's order subordinating, on equitable grounds, certain of their claims against the debtor, Lemco Gypsum, Inc. Finding that the bankruptcy and district courts articulated the proper standard for exercise of the equitable subordination power, but that they, nevertheless, misapplied that standard to the facts surrounding one of the claims in this case, we reverse in part.
 
 
 2
 The Millers were the sole stockholders, officers and directors of Lemco Gypsum, Inc., which they formed in 1979 to convert calcium sulfate industrial waste into gypsum briquettes for use in cement production. Although such a process had been profitably in place for several years in Europe, it had never been tried before in the United States. The Millers hoped to duplicate the European success, while solving an industrial pollution problem for Savannah, Georgia at the same time. As the site for Lemco's facility, the Millers selected land adjacent to American Cyanamid Company's Savannah plant, then a major producer of calcium sulfate waste. In addition to a $200,000 capital investment and a $400,000 loan from the Millers, $3,000,000 was raised in the sale of industrial revenue bonds issued in early 1980 by the Savannah Port Authority, secured by the hard assets of Lemco. C & S National Bank acted as indenture trustee and the Prudential Insurance Company of America purchased the bonds.
 
 
 3
 As additional security for payment of the bonds, each Miller, acting in his individual capacity, signed a personal guaranty of the bond obligation. To secure their obligations under the guaranty, the Millers entered into a pledge agreement with C & S, pledging a note receivable received from the 1978 sale by them of the Dundee Cement Company.
 
 
 4
 In 1982, prior to Lemco's 1983 commencement of operations, Lemco and the Millers had defaulted on the industrial revenue bonds. In September 1982, C & S sued the Millers in their individual capacities in Georgia state court under the personal guaranty each had signed. Two months later C & S obtained a default judgment. In December 1982, the Millers entered into a consent agreement to pay the judgment from proceeds of the Dundee note, while C & S and Prudential consented to a forbearance agreement with the Millers. After a time, however, the Millers defaulted on this undertaking as well. Finally, in October 1985, the Millers paid C & S the remaining balance due on the guaranty, $1,369,890.72. The Millers were able to obtain this sum by liquidating their interest in the Dundee note. As a condition to paying C & S the balance due, however, the Millers requested and obtained assignment of the bonds from Prudential.
 
 
 5
 Lemco's operations never reached full capacity, continued only intermittently, and were marred by a series of mishaps, including a fire and the failure of a conveyor-belt system to work as planned. Lemco was never profitable, and lost more than $1.3 million in both 1983 and 1984. It did not operate at all in 1985. Lemco's creditors grew increasingly impatient and pressed for payment of their claims. Frank Miller, Lemco's on-site supervisor of production and the only Miller to receive compensation from Lemco, was able to delay paying the creditors and forestall legal action on their part by repeatedly promising that new financing, increased productivity, and a new dawn of profitability lay on Lemco's horizon.
 
 
 6
 Despite what the bankruptcy court termed as credible efforts by the Millers, Lemco closed its doors for good on December 31, 1985. On October 3, 1986, the Millers put Lemco in bankruptcy. In round numbers, there is $300,000 in the bankruptcy estate. The settlement of a lawsuit between Lemco and Kemira, Inc. (the company that purchased American Cyanamid's Savannah plant in 1985) accounts for $100,000; the sale of Lemco's hard assets (purchased at auction by the Millers' holding company) accounts for the remaining $200,000.
 
 
 7
 The Millers filed three claims against Lemco in the bankruptcy proceedings. First, they filed a secured claim based on their having satisfied C & S' judgment against them on the bond guaranty. The Millers urge that by paying off the judgment they became secured creditors of Lemco in the amount of $1,369,890.72, subrogated to the rights of Prudential. Second, they filed a claim as judgment creditors based on a $131,945.51 judgment against Lemco assigned to them by Omni-Lift, Inc. The judgment originally ran against both Lemco and Frank and L.E. Miller, Jr. The Millers paid Omni-Lift $30,000 on October 10, 1986, seven days after Lemco filed for bankruptcy, and Omni-Lift assigned its entire judgment against Lemco to Frank and L.E. Miller, Jr. Third, the Millers filed an unsecured claim based on their initial loan of $400,000 to Lemco.
 
 
 8
 In swift response to the filing of these claims, three of Lemco's unsecured creditors instituted this action seeking subordination of the Millers' claims to their own. The trustee for Lemco later joined the action on the side of the creditors, to the extent of urging that the claims of the Millers as insiders required scrutiny.
 
 
 9
 Following trial, the bankruptcy court first, classified the Millers' industrial revenue bond claim as unsecured and subordinated it to all other unsecured claims; second, subordinated the judgment lien claim to all other unsecured claims except to the extent of the $30,000 that Frank and L.E. Miller, Jr. had paid to obtain it; and third, declined to subordinate the Millers' unsecured loan claim to other unsecured loans. 108 B.R. 831 (Bkrtcy.S.D.Ga.1988). On the Millers' appeal (the creditors and trustee did not cross-appeal), the district court affirmed. This appeal followed.
 
 
 10
 Title 11 U.S.C.A. Sec. 510(c) adopts the long-standing judicially developed doctrine of equitable subordination under which a bankruptcy court has power to subordinate claims against the debtor's estate to claims it finds ethically superior under the circumstances. In re N & D Properties, 799 F.2d 726, 731 (11th Cir.1986); see also Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); 9A Am.Jur.2d. Bankruptcy Secs. 745-49 (1980). Proper exercise of the equitable subordination power can take place only where three elements are established:
 
 
 11
 (1) The claimant must have engaged in some type of inequitable conduct,
 
 
 12
 (2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant,
 
 
 13
 (3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.
 
 
 14
 In re Mobile Steel, 563 F.2d 692, 700 (5th Cir.1977) (citations omitted); accord N & D Properties, 799 F.2d at 731; In re Multiponics, 622 F.2d 709, 713 (5th Cir.1980). The inequitable conduct need not be related to the acquisition or assertion of the claim. Mobile Steel, 563 F.2d at 700. The claim can be subordinated only to the extent necessary to offset the harm suffered by the bankrupt and its creditors on account of that conduct. Id. at 701.
 
 
 15
 Because the claims at issue are asserted by "insiders" of the debtor,[1] two principles guide the decision. First, once the party seeking equitable subordination presents material evidence of unfair conduct, the insider-claimant can rescue its claims from subordination only by proving the good faith and fairness of its dealings with the debtor. N & D Properties, 799 F.2d at 731; Multiponics, 622 F.2d at 714; Mobile Steel, 563 F.2d at 701.
 
 
 16
 Second, the court must subject the insider-claimant's dealings with the debtor to special scrutiny, examining them "with a large measure of watchful care." Mobile Steel, 563 F.2d at 702, quoting Washburn v. Green, 133 U.S. 30, 43, 10 S.Ct. 280, 284, 33 L.Ed. 516 (1890); accord Pepper, 308 U.S. at 306, 60 S.Ct. at 245.
 
 
 17
 Plaintiffs satisfied their initial burden of presenting material evidence of unfair conduct. Under the Millers' direction, Lemco made purchases and had other business dealings with companies the Millers controlled; the Millers raised their son and brother Frank's salary during a time that Lemco was suffering losses and declining to pay creditors; Frank Miller repeatedly dissuaded creditors from pursuing legal action against Lemco, but Lemco never paid the creditors; and the Millers' retirement of the bond debt and settlement of the Omni-Lift judgment came close to the filing for bankruptcy, and had the effect of giving them stronger claims.
 
 
 18
 Contrary to the district court's decision, however, the Millers demonstrated the good faith and fairness to the corporation of their dealings (except the Omni-Lift judgment, discussed below). As the bankruptcy judge stated, Frank Miller's $25,000 salary was not unreasonable given his responsibilities. The dealings Lemco had with Miller-controlled companies were favorable to Lemco. As defense counsel noted in the bankruptcy court:
 
 
 19
 "You've got, I believe, a family that was trying very hard to make this work and, by using personal resources or resources of affiliated corporations, they were able to do things cheaper than they could have done them if they had to go out and buy the same products or obtain the same services from third parties."
 
 
 20
 (Trial Transcript at 67). The evidence shows that the Millers were sincerely motivated by a desire to refinance Lemco, not to protect themselves in bankruptcy, and that they honestly believed refinancing would come through. It was only after Kemira, Inc. purchased American Cyanamid's plant and then cancelled the contract Lemco had with American Cyanamid, which deprived Lemco of a site and source of raw material essential to the operation, that the Millers abandoned the effort.
 
 Claim on Revenue Bonds
 
 21
 With respect to the Millers' claim on the bonds, plaintiffs cannot show that they suffered any injury or unfair disadvantage by the Millers' purchase. Since the bonds were secured by the hard assets of Lemco, the claim on the bonds applies only to the $200,000 derived from the auction sale of those assets. The unsecured creditors' claims with respect to that sum would have been subordinate to the bonds' secured interest in the event the bonds had been retained by Prudential. Lemco would be primarily liable on the bonds even if the Millers remained as guarantors. The equitable subordination of the bond claim under the facts of this case transgresses the public policy we have often expressed: "a desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of capital." Mobile Steel, 563 F.2d at 701 (citations omitted).
 
 Claim on Judgment
 
 22
 The bankruptcy and district courts properly subordinated the greater part of the judgment lien. At the time Frank and L.E. Miller, Jr. settled the Omni-Lift judgment, Lemco had already filed for bankruptcy. Presumably the entire judgment could have been settled for the $30,000 which Omni-Lift was paid. In settling, but taking an assignment of the full amount of the judgment, the Millers were "motivated by their own interests" and their action "inured to their benefit and to the detriment" of Lemco's creditors. DeMet v. Harralson, 399 F.2d 35, 38-39 (5th Cir.1968). By subordinating all of this claim, except what the Millers actually paid for it, the bankruptcy and district courts acted in conformity with the Bankruptcy Code, offsetting the harm which Lemco's creditors suffered on account of the self-interested conduct. See Mobile Steel, 563 F.2d at 701.
 
 
 23
 AFFIRMED in part and REVERSED in part.
 
 
 24
 MORGAN, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 25
 I agree with the majority that the bankruptcy and district courts properly subordinated the greater part of the judgment lien asserted by the Millers. I respectfully disagree, however, with the conclusion that the lower courts erred in subordinating the Millers' bond claim. As a practical matter, the majority opinion will result in the distribution of the majority of Lemco's assets to the Millers to the detriment of the remaining creditors. This result is clearly inequitable under the facts of this case.
 
 
 26
 There can be no dispute that the Millers were insiders who owed a fiduciary duty to Lemco. In re N & D Properties, 799 F.2d 726, 731 (11th Cir.1986). As insiders and fiduciaries, special scrutiny must be given to the Millers' dealings with Lemco. In re Multiponics, 622 F.2d 709, 714 (5th Cir.1980). I agree with the majority that the insider claimants, the Millers, can rescue their bond claim from subordination only by proving the good faith and fairness of their dealings with the debtor. This, in my opinion, the Millers failed to do. They increased the salary of Frank Miller from $14,000 to $25,000 per year at a time when the corporation had been suffering ongoing substantial losses. At the same time, the Millers were moving to satisfy the bond claim and Frank Miller was dissuading creditors from pursuing legal action against Lemco. As the bankruptcy court found, the choice of structuring of the bond transaction was the Millers', made while Lemco was insolvent. It had the effect of giving them a larger secured claim in the instant bankruptcy proceeding, instead of an unsecured one, when those same assets could have been utilized at an earier date to improve Lemco's financial position.
 
 
 27
 While not explicitly rejecting the Millers' testimony that their motive in satisfying the bond debt was to improve their chances of obtaining new financing for Lemco, a rejection of this testimony is implicit in the bankruptcy court's findings that the effect of the Millers' actions was to confer on themselves the status of secured creditors. The district court concurred when it stated that this inequitable conduct by the Millers, the purchase of the bonds, conferred an unfair advantage on the Millers and caused injury to Lemco's creditors. We should not substitute our judgment on this credibility determination for that of the bankruptcy court, affirmed by the district court, unless it is clearly erroneous. DeMet v. Harralson, 399 F.2d 35, 38 (5th Cir.1968).
 
 
 28
 I would affirm the judgment of the district court in its entirety.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 Title 11 U.S.C.A. Sec. 101(30)(B) provides that if the debtor is a corporation, each of the following is an "insider":
 (i) director of the debtor;
 (ii) officer of the debtor;
 (iii) person in control of the debtor;
 (iv) partnership in which the debtor is a general partner;
 (v) general partner of the debtor; or
 (vi) relative of a general partner, director, officer, or person in control of the debtor[.]