**In re 1236 DEVELOPMENT CORP., Debtor.**

**Stephan M. RODOLAKIS, Chapter 11 Trustee,**

v.

**Dr. Andrew CHERTOFF, Defendant.**

**Bankruptcy No. 93–41990–HJB. Adv. No. 94–4320.**

United States Bankruptcy Court, D. Massachusetts.

Nov. 3, 1995.

Carl Aframe, for Chapter 11 Trustee.

John Stocks, for Defendant.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

The matter before the Court arises from an adversary proceeding, filed by Stephan M. Rodolakis, Chapter 11 Trustee (the "Trustee" or "Plaintiff") against Dr. Andrew Chertoff ("Chertoff" or the "Defendant"). The Complaint seeks equitable subordination, pursuant to 11 U.S.C. § 510(c), of a mortgage given to Chertoff by the debtor 1236 Development Corporation (the "Debtor"). After a trial on the Complaint, the Court took its resolution under advisement.

### I. FACTS

The following constitutes findings of fact in accordance with Bankruptcy Rule 7052. *See* Fed.R.Bank.P. 7052.

The Debtor, a Massachusetts corporation, was formed on June 2, 1990 for the purpose of constructing and managing a medical office building located at 1232–1236 Main Street, Holyoke, Massachusetts (the "1236 Building"). The officers of that corporation included Chertoff, as President, Bernard McKernan, Jr. ("McKernan") as Treasurer, and Peter F. Brady, as Clerk. At the time of corporate formation, Chertoff and McKernan (principal of McKernan Construction Company, Inc. ["McKernan Construction"]) each owned 50% of the outstanding shares of the Debtor's stock.[1]

At the inception of the 1236 Building project, McKernan informed Chertoff that he did not have sufficient resources in the form of cash or property to contribute 50% of the capital for the project. Therefore, Chertoff agreed to contribute the land for the 1236 Building, as well as additional cash, while McKernan agreed to contribute the anticipated construction *profit* which would accrue to McKernan Construction from the project. Chertoff and McKernan also jointly purchased for the Debtor the land adjacent to the property from Meyers Computer Corporation ("Meyers Computer") to be used as additional frontage and parking for the 1236 Building.[2]

In late 1990 and early 1991, the Debtor completed the plans required to construct the 1236 Building. On April 1, 1991, the Debtor executed an Agreement with McKernan Construction to construct the building for the approximate amount of $1,608,000.00, including basic building and tenant fix up costs. The Debtor obtained a commitment letter for financing from Springfield Institute for Savings ("SIS") in the amount of $1,300,000.00. Prior to the loan closing, on May 17, 1991, SIS notified the Debtor that it was concerned about a gap between the amount of the first mortgage financing commitment and the contract price, and therefore, required proof of additional money available for the project.

In a letter, dated May 30, 1991, McKernan notified SIS that the shareholders had al-

---

1. Chertoff and McKernan had enjoyed a mutually advantageous business history. Prior to the incorporation of the Debtor, Chertoff and McKernan, through a partnership known as C & M Partnership, had renovated an existing building in Holyoke, Massachusetts. Also, Chertoff had earlier hired McKernan Construction to ren-

ovate an abandoned garage into a physical therapy unit.

2. In connection with the purchase, the Debtor granted to Meyers Computer a purchase money mortgage in the amount of $40,000.

ready invested approximately $350,000 into the project between soft costs and the purchase of the Meyers Computer property.[3] McKernan also indicated that the Debtor would be able to obtain an additional $300,000 line of credit which would bridge the gap between the first mortgage financing and the contract price.

SIS agreed to allow the placing of a second mortgage on the 1236 Building to secure that line of credit on the condition that (1) the mortgage be subordinated to the Debtor's obligation to SIS, and (2) an irrevocable line of credit be issued to SIS to ensure that the money would be available to SIS to pay the contractor. SIS was not concerned about the designation of the line as a loan or equity infusion.

In order to satisfy the SIS condition, Chertoff personally obtained an irrevocable line of credit from the Bank of Western Massachusetts ("BWM") in favor of SIS in the amount of $300,000.[4] To secure the line of credit, Chertoff granted to BWM certificates of deposit in the total amount of $179,354.17 and an assignment of the business assets of Andrew B. Chertoff, M.D., P.C.

Not anticipated in the early projections were subsequent substantial cost increases. At various times during the fall of 1991, Chertoff and McKernan and Steven Dane ("Dane"), the Debtor's accountant, met to discuss cost overruns resulting from design changes[5], additional costs for a water line and other related soft costs which totalled the sum of $200,000.00. Chertoff personally paid approximately $60,000 for the water line

costs and an additional $100,000 on account of the design changes and for amenities attributed to *his suite* in the 1236 Building.[6]

At various times during the fall of 1991, Chertoff and McKernan had discussions relative to Chertoff obtaining a second mortgage to secure repayment by the Debtor of Chertoff's obligation to BWM. McKernan testified that Chertoff was well aware that McKernan Construction was owed a substantial amount of money on the project. In or around November, 1991, Dane recommended that Chertoff obtain a second mortgage on the 1236 Building to ensure repayment of his obligation to BWM under the line of credit. Given the substantial amount of money owed to McKernan Construction, McKernan had little choice but to agree to the granting of a second mortgage to Chertoff.

On or around December 11, 1991, the Debtor executed a promissory note (the "Note") to Chertoff for "all amounts advanced by Holder to Borrower up to the sum of $350,000" and secured payment of the Note and "all further sums presently and hereafter due from the Mortgagor" with a second mortgage (the "Mortgage") to Chertoff on the 1236 Building.

Chertoff testified at trial that at the time of the execution of the Note and Mortgage, he understood conceptually that his contribution in the amount of $350,000[7] was a secured loan, but at a deposition, conducted in this case, Chertoff stated that he did not know whether his contribution was a loan; instead, he understood only that his contribution was personal money "to keep the busi-

---

3. On June 4, 1991, Dane prepared for BWM a schedule of the developer's equity ($683,000) required for the project. The developer's equity was itemized as follows: $150,000—"existing land", $246,000—"equity in the new land and the building", $150,000—"developer cash already invested"; and $127,000—"deferred construction profit."

4. Chertoff testified that he personally arranged for the loan for several reasons. First, he understood the contribution to be a precondition of the SIS loan, and did not want to lose the loan commitment from SIS. Second, Chertoff did not want to lose a lease commitment with Providence Hospital. Third, Chertoff understood that the Debtor could not obtain financing at a lower interest rate.

5. McKernan testified that Chertoff hired a consultant to make design changes which would enhance the architectural appeal of the building. The design changes included, but were not limited to, the addition of a basement area and elevator access thereto, the installation of stained glass windows, and the upgrade of hardware and carpeting.

6. There was no evidence that the payments by Chertoff offset the cost of all the improvements made to his suite.

7. The testimony was unclear as to when Chertoff actually loaned the $50,000 in addition to $300,000 line of credit.

ness going". When asked at the deposition whether he had any expectation of repayment, Chertoff stated that it never crossed his mind either way. In fact, Chertoff testified to an unusually high level of ignorance associated with all financial aspects of his business affairs. He claimed to rely heavily on the advice and expertise of his attorney and accountant. He testified that, at the time of the execution of the Note and Mortgage, he was unaware of any unpaid creditors. He testified that he did not know that the building was going to cost more than the SIS loan. He testified that did not understand the mechanics of the loan, specifically, whether his contribution would be characterized as debt or equity.[8]

In fact, at the time of the execution of the Note and Mortgage, the project was in significant difficulty apparent to all but a person who would prefer not to identify the obvious. The 1236 Building was still under construction. There were no tenants. There was approximately $660,225 of outstanding invoices on the project, much owed to McKernan Construction which could not for much longer withstand the delay in payment[9]. Notwithstanding tax returns showing the Debtor balance sheet solvent during this period, that solvency depended partly on McKernan's ability to pay his deferred capital contribution[10]. But McKernan was failing.

The Trustee introduced the expert testimony of Robert Emens ("Emens") who had prepared appraisals of the 1236 Building for SIS (in 1991) and McKernan Construction (1992). Utilizing the income approach, the 1236 Building was appraised for $1,800,000 in July, 1991, and $1,830,000 in July, 1992. The appraisals incorporated assumptions of income derived from McKernan about the projected rent structure. Overall, the appraisal projected approximately $344,000 income generated during the first full year of operation, November 30, 1992 through November 30, 1993. These projections[11] were overly optimistic as Dane testified that, as of November 30, 1993, that previous year's gross rental income was $200,782.00.

Mark Leicester ("Leicester"), Chertoff's expert, offered testimony as to the Debtor's financial status as of November 30, 1991. Leicester used a balance sheet analysis to demonstrate that the Debtor was not undercapitalized at that time. He assigned a value to the Debtor's assets at $2,585,000, relying on various assumptions. However, Leicester valued the building by using the Emens appraisal of July, 1992. But the Emens appraisal contained various erroneous assumptions of the project's income stream. Leicester also assumed that approximately $300,000 was available to the Debtor from Chertoff's loan, notwithstanding that $100,000 had already been drawn down as of November 30, 1991. Leicester also valued McKernan's pledge receivable in the amount of $85,000 without considering whether McKernan would be able to pay it back. Finally, Leicester assumed approximately $16,000 was owed by tenants, notwithstanding the fact there were no tenants in the building as of November 30, 1991. In view of those deficiencies, neither the Leicester nor Emens appraisals had probative value other than to demonstrate the project's failure to live up to the Debtor's expectations.

---

8. The Court found Dr. Chertoff's assertions of ignorance generally not credible.

9. The Debtor's tax returns reflected that as of November 30, 1991, accounts payable were in the approximate amount of $660,225. Of that amount, $546,000 was owed to McKernan Construction.

10. This amount included the stock subscription receivable due from McKernan in the amount of $85,000 and an additional amount of approximately $120,000, related to a percentage of the construction contract that McKernan had committed to contribute.

11. The appraisal predicted that the rental income generated from the Providence Hospital (which had committed to leasing space from the Debtor at the inception of the project) would increase by approximately 28% from $12,000 per month (Year 1) to $15,000 per month (Year 5). It further reflected that the rental income generated from Chertoff's office and the X–Ray areas would remain at a *flat rate* of $5365.50 per month during Years 1 through 5, and then would *increase* to $5961.00 per month during Years 6 through 10. The difference in treatment was not explained, but was obviously favorable to Chertoff and not in the Debtor's best interest.

In April of 1992, McKernan, in his capacity as President of McKernan Construction, sent a letter to Connecticut National Bank seeking approximately $1,600,000 to refinance the project. A pro forma statement attached to his letter of April 14, 1992, revealed that the total construction costs, as of April 13, 1992, were approximately $2,455,000.00, a substantial increase from the amount originally projected. The statement, however, omitted the outstanding debts owed to McKernan Construction and the second mortgage held by Chertoff. This letter was sent, with Chertoff's knowledge, to a number of lending institutions without any success. Chertoff testified that he had no opinion as to why McKernan was trying to obtain financing; he stated that he was still unaware, as of April of 1992, that there were any "real problems" with creditors.

In the fall of 1992, Chertoff attended a meeting with McKernan at McKernan's office with approximately twenty (20) creditors, McKernan Construction subcontractors. Chertoff testified that at this meeting he first became aware of the substantial and outstanding bills owed to creditors [12]. Based on McKernan's alleged statement that the vendors were owed approximately $350,000, Chertoff offered to subordinate his Mortgage to a third position and give the creditors a second position. However, approximately two days later, after Chertoff claimed to discover that the subcontractors were actually owed approximately $650,000, Chertoff rescinded his offer to subordinate his mortgage. However, Chertoff testified that he

continued to lend money to the Debtor to complete the project.

As of November, 1993, the total cost of the project had grown to over three (3) million dollars. On or around October 20, 1993, McKernan Construction filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Approximately nine (9) months later, McKernan, individually, filed a voluntary Chapter 7 petition on August 24, 1994.

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 20, 1993. Upon a motion filed by the United States Trustee, the Court, on October 13, 1993, appointed a Chapter 11 Trustee. Chertoff filed a proof of claim in the amount of $800,011.66, claiming $409,000 as secured, and $408,000 as unsecured. On October 17, 1994, the Trustee filed the instant Complaint seeking equitable subordination, pursuant to § 510(c), of the Mortgage given to Chertoff. After a trial, the Court took the matter under advisement and ordered the parties to submit post trial memoranda.

## II. DISCUSSION

■ The issue before the Court is the applicability of 11 U.S.C. § 510(c) to the instant facts presented.[13]

Section 510(c) of the Bankruptcy Code provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim

---

12. The Court finds this testimony incredible.

13. In his post trial memorandum, Chertoff also makes the argument that the Trustee's claims are barred by the principle of res judicata, specifically, issue preclusion. In support thereof, Chertoff asserts that the enforceability of the Mortgage given to Chertoff has already been fully litigated in another proceeding, and therefore, cannot be raised in the instant proceeding. Chertoff is confusing two concepts—that is, validity and enforceability. In an adversary proceeding, *Rodalakis v. Chertoff (In 1236 Development Corp.)*, No. 93–41990–HJB, Adv. No. 4150 (Bankr.D.Mass. July 18, 1994), *aff'd*, 177 B.R. 2 (D.Mass.1995), this Court determined that the Mortgage given to Chertoff was *valid*. The instant adversary proceeding does not concern the validity of the

mortgage; instead, it is about equitable subordination of the Mortgage—that is, the ultimate enforceability of the Mortgage as a secured claim in the distribution scheme of the instant bankruptcy case. There is no identity of issues, and therefore, the principle of res judicata (specifically, issue preclusion) does not bar the instant proceeding. *See Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir.1994) (issue preclusion requires that (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding judgment; and (4) the determination must have been essential to the judgment).

to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. 510(c).

■ The seminal case on equitable subordination is *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977) wherein that court established three requirements for the application of the doctrine of equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.[14] *Id.* at 699–700. Most courts follow *Mobile Steel, see e.g., Matter of Herby's Foods, Inc.*, 2 F.3d 128 (5th Cir.1993); *First National Bank of Barnesville v. Rafoth (In re Baker & Getty Financial Services, Inc.)*, 974 F.2d 712 (6th Cir.1992); *In re Vitreous Steel Products Co.*, 911 F.2d 1223 (7th Cir.1990); *Fluharty v. Wood Products, Inc. (In re Daugherty Coal Co. Inc.)*, 144 B.R. 320 (N.D.W.Va.1992), including courts in the First Circuit. *See Capitol Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604 Columbus Avenue Realty Trust)*, 968 F.2d 1332, 1353 (1st Cir.1992); *Boyajian v. DeFusco (In re Giorgio)*, 862 F.2d 933, 938 (1st Cir.1988); *In re Beverages International Ltd.*, 50 B.R. 273, 281 (Bankr.D.Mass.1988). *But see Ferrari v. Family Mutual Savings Bank (In re New Era Packaging, Inc.)*, 186 B.R. 329 (Bankr. D.Mass.1995); *In re SPM Manufacturing Corp.*, 163 B.R. 411 (Bankr.D.Mass.1994).[15]

■ When reviewing the first prong of the *Mobile Steel* test, most courts look to the three categories of inequitable conduct enumerated by the Fifth Circuit in *Wilson v. Huffman (In re Missionary Baptist Foundation, Inc.)*, 712 F.2d 206 (5th Cir.1983), (1) fraud, illegality, or breach of fiduciary duty, (2) undercapitalization, or (3) claimant's use of the debtor as an instrumentality or alter ego of the debtor. *See In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir.1991); *Waslow v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D.Pa.1993), *aff'd*, 37 F.3d 1487 (3rd Cir. 1994); *In re Dan–Ver Enterprises, Inc.*, 86 B.R. 443, 448 (Bankr.W.D.Pa.1982); *In re Beverages International Ltd.*, 50 B.R. at 281.

■ In examining a claim for equitable subordination, special scrutiny is given to the conduct of insiders[16], and the allocation of the burden of proof is adjusted accordingly. *See Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *Machinery Rental Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 713 (5th Cir.1980); *In re Beverages International Ltd.*, 50 B.R. at 280–81. In *Pepper v. Litton*, the Supreme Court ruled that the dealings between fiduciaries and their corporations:

are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

308 U.S. at 306, 60 S.Ct. at 244.

■ In the *Multiponics* decision, the Fifth Circuit further stated:

This court in [Mobile Steel] elaborated on the nature of the burden of proof requirement. We explained that, once a fiduciary-claimant filed a verified proof of claim, the objecting trustee has the burden of coming forward with enough substantiation

---

14. The third requirement may be moot given that § 510(c) incorporates the common law of equitable subordination into the Bankruptcy Code. *See 80 Nassau Associates v. Crossland Federal Savings Bank (In re 80 Nassau Associates)*, 169 B.R. 832, 841 (Bankr.S.D.N.Y.1994). *Mobile Steel* was decided prior to the Bankruptcy Reform Act of 1978, which created § 510(c).

15. Following Judge Queenan's analysis in *In re SPM Manufacturing Corp.*, this Court, in the case of *In re New Era Packaging, Inc.*, used § 510(c) to equitably subordinate a stock redemption claim despite the absence of inequitable conduct of the claimants.

16. There is no dispute that Chertoff is an insider of the Debtor. *See* 11 U.S.C. § 101(31)(B).

to overcome the fiduciary's prima facie case. Only after the objecting trustee meets the burden of coming forward, will the burden of proving unfairness shift to the fiduciary. This proof allocation provides a proper balance of burden, assuring that the trustee does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at the mere cry or inequity by the trustee.

622 F.2d at 713. *See also Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir.1990); *Allied Eastern States Maintenance Corp. v. Miller (Matter of Lemco Gypsum, Inc.)*, 911 F.2d 1553, 1557 (11th Cir.1990); *In re Daugherty Coal Co., Inc.*, 144 B.R. at 324: *In re Beverages International Ltd.*, 50 B.R. at 280. Based on the foregoing standard, the Trustee has the burden of production—that is, to produce sufficient evidence to establish a prima facie case of equitable subordination of Chertoff's claim. Once the burden of production is met, the burden of persuasion shifts to Chertoff to prove the inherent fairness and good faith of the challenged transaction.

■■■ The Trustee relies on the definitions of undercapitalization set forth in the *Mobile Steel* decision. The primary inquiry for determining undercapitalization is whether, under the circumstances, a reasonably prudent person with a general business background would deem the company undercapitalized. 563 F.2d at 703. More specifically, the *Mobile Steel* court stated:

[1] Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized.

[2] Capitalization is inadequate if, at the time when the advances where made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

563 F.2d at 703.

In the instant case, the Trustee asserts that capitalization is properly viewed in hind-

sight. In support thereof, the Trustee relies on the *Multiponics* decision. In *Multiponics*, the Fifth Circuit adopted the definitions of capitalization set forth in *Mobile Steel* and went on to state:

The time frame for an analysis of the extent of capitalization may vary. Generally we look to initial capitalization, asking whether a company was adequately capitalized at the time of its organization. This was the approach employed in our decision of *In re Mobile Steel, supra*. Subsequent capitalization may also be relevant to our inquiry, however, in at least two respects. First, evidence of inadequate subsequent capitalization may be indicative of initial undercapitalization. While we do not condone an approach of hindsight in capitalization cases, a view of the later time frames may shed light on the earlier ones. Second, proof of subsequent undercapitalization may be further proof of inequitable conduct, such as actions of gross mismanagement, self-interest, and the like, and, if the information is analyzed with care, may shed light upon the economic reality of financial commitments to a company.

622 F.2d at 717–18.

While the *Multiponics* court suggested that inadequate subsequent capitalization may be probative of initial capitalization or of inequitable conduct, it also stated that it did not condone the hindsight approach. *See id.* However, as the Fifth Circuit suggested, the hindsight approach may shed light on the debtor's initial capitalization. *See id.*

The Trustee relied almost exclusively on the hindsight approach to establish undercapitalization. The Trustee relied on (1) the total cost of the project which, as of November, 1993, was approximately 3.1 million dollars, (2) testimony tending to show that the cost overruns of the project (other than the water main costs) were "extras" requested by Chertoff, (3) the fact that the building was not timely completed, and (4) the projections of income which proved to be overly optimistic.

■■■ The hindsight approach alone does not adequately elucidate whether an initial

capital contribution is sufficient. If the hindsight test were the only measure, capital contributions would always be deemed insufficient where the Debtor subsequently suffered insolvency. But in this case, there was one further critical element. From the inception of the project, 50% of the capital contribution which was agreed by the stockholders to be afforded to the Debtor was provided in the form of a receivable from a stockholder who claimed not to be able to make the payment from his readily available funds. McKernan was to find the resources to make his capital contribution from the *profit* made by his company in the construction of the 1236 Building. Presumably, if no profit was realized, McKernan would be unable to meet his obligations to the Debtor, and, in fact, that failure became a reality when McKernan Construction could not finish the project. The stockholders, by their agreement, identified the appropriate level of capital contribution, but failed from the very outset to afford an appropriate methodology for delivering it to the Debtor. Rather, by making the capital contribution dependent on the profit of McKernan Construction, they converted a capital contribution which should have been made *to* the Debtor into an investment *by* the Debtor in McKernan Construction. This was an unreasonable way to provide for the Debtor's capital needs and, under the totality of the circumstances, this Court finds that the Debtor, from the very outset, was undercapitalized.

However, the inquiry is not ended. Undercapitalization alone is insufficient to subordinate the claim of an insider. *See In re Hyperion Enterprises, Inc.,* 158 B.R. 555, 560 (D.R.I.1993); *de'Medici v. Salson Express Co., Inc. (In re Lifschultz Fast Freight Corp.),* 181 B.R. 346, 354 (Bankr.N.D.Ill. 1995); *In re Beverages International Ltd.,* 50 B.R. at 282. Inequitable conduct must be shown to support a claim for equitable subordination. *Beverages International,* 50 B.R. at 282.

The Trustee alleges the following as evidence of insider misconduct: (1) Chertoff had knowledge that the contract price was $1.6 million, while the loan from SIS was $1.3 million; therefore, in order to adequately capitalize the project, an additional $300,000 was required; (2) Chertoff caused the Debtor to incur additional costs arising from Chertoff's special "extras" for his suite and from design changes he ordered for the building at a time when the Debtor's capitalization was insufficient; (3) Chertoff's rental rate in the 1236 Building was on particularly favorable terms, when compared to the projections in the Emens appraisal of the anticipated rental rates from other tenants, thus reducing the ultimate cash flow of the building; (4) Chertoff knew or should have known that there were substantial outstanding debts owed to creditors, including McKernan Construction, at the time of the execution of the Note and Mortgage; and (5) Chertoff knew or should have known that McKernan was unable to pay his deferred capital contribution.

This Court finds that the Trustee has established the foregoing allegations and that, taken together, they are persuasive of inequitable conduct by a fiduciary. Particularly, Chertoff's actions in increasing the cost of the project with design changes to the building and "extras" to his suite at a time when the Debtor was struggling to overcome undercapitalization is disturbing. At the very least, the Trustee has established a prima facie case and Chertoff has failed to persuade this Court of the good faith and the inherent fairness of his transactions with the Debtor. *See Beverages International,* 50 B.R. at 285.

Furthermore, the Court finds the entire transaction relative to the Note and Mortgage to be incapable of withstanding close scrutiny. Chertoff's claimed ignorance as to the import of the line of credit transaction can not go unnoticed. It is Chertoff who testified that he arranged for the line of credit with no specific understanding of the character of the transaction and no specific expectation of repayment. That testimony is supported by the lack of any documentation commonly associated with debt to Chertoff at the time that Chertoff arranged for the BWM line of credit for SIS. It was only when the project began to experience difficulty, when the debts owed to creditors (most notably McKernan Construction) threatened the project (and, therefore Chertoff's investment), that Chertoff for the first time made

84

the decision to characterize the line of credit as debt and secure repayment in such a way to give the obligation priority over the claims of other creditors.

By self dealing to the Debtor's detriment and by securing his otherwise capital contributions with a security interest in the Debtor's assets, Chertoff conferred upon himself an unfair advantage and harmed the Debtor and its creditors. In so doing, the balance of the first prong and the establishment of the second prong of the *Mobile Steel* test is met. To the extent that the third prong of the *Mobile Steel* test retains vitality, grounds for its establishment are not hard to find. It was the purpose of § 510(c) and the holdings of the cases which it codified to avoid inequitable results which might arise from stockholder overreaching. This Court's determination herein that Chertoff's claim should be equitably subordinated to the claims of unsecured creditors whose interests he harmed comports with the concerns enumerated by the Supreme Court in *Pepper v. Litton* and its progeny.

For the foregoing reasons, the Court hereby enters judgment in favor of the Plaintiff and subordinates the Note and Mortgage, as well as the claim represented thereby, to the claims of general unsecured creditors, pursuant to § 510(c) of the Bankruptcy Code. A separate judgment will issue in conformity herewith.