CUDAHY, Circuit Judge.
In a case under chapter 7 of the Bankruptcy Code, the trustee requested the bankruptcy court to equitably subordinate a creditor’s secured claim that was based on the creditor’s loan to the debtor. Equitable subordination of a claim moves the creditor down in the order of payment out of the assets in the bankruptcy estate, generally reducing (or eliminating) the amount the creditor can recover. In this case, the trustee argued that the loan should be treated as a capital contribution (i.e., as equity) because it was made by insiders of the debtor, the debtor was undercapitalized and the debtor and its principals engaged in inequitable conduct. The bankruptcy court denied the trustee’s request, finding that the trustee failed to establish either undercapitalization or sufficient inequitable conduct. .The trustee appealed to the district court, which reversed and remanded to the bankruptcy court, ordering the subordination of the claim. The district court concluded that the bankruptcy court committed clear error when it determined that the debtor was adequately capitalized. As for inequitable conduct, the district court stated, “creditor misconduct is not a necessary prerequisite for application of equitable subordination,” citing In re Virtual Network Services Corp., 902 F.2d 1246, 1249-50 (7th Cir.1990). This appeal followed. We clarify the relationship between undercapitalization and equitable subordination: the general-rule is still that undercapitalization alone is insufficient for equitable subordination — here of a secured claim. We also conclude that the bankruptcy court’s finding of adequate capitalization is not clearly erroneous. But we are more concerned than the bankruptcy court about certain raises to the insiders cited by the trustee. On that issue, we remand to the bankruptcy court for further consideration of the trustee’s equitable subordination request.
I. Background
A business is ailing. Revenues are down, profits gone. Rather than let it die, the owners decide to try reviving it. Doing so will require an infusion of new funds. The owners drum up the needed funds but face a choice: which legal form should the owners use, equity or debt?
If the business is closely held, the advantage will be to debt, preferably secured. Equity classically carries the right to the firm’s residual earnings. But in a closely-held company, this advantage means little, for the owners already have it through their preexisting equity stakes. A loan, on the other hand, will provide the firm with needed funds while limiting the owners’ risk that the com *342 pany will go bankrupt and the new funds will end up in the wallets of the unsecured creditors. Tax advantages might also accrue.[1] Of course, in opting for debt, the owners also accept a trade-off: outside lenders will or ought to be more reluctant to extend credit to what is now a more heavily-leveraged firm.
An unfair advantage to the owners, allowing them to reap the benefits of both debt and equity? Maybe. Will a bankruptcy court respect this choice of form? Not always. The power of equitable subordination, codified at 11 U.S.C. § 510(c), allows a bankruptcy court to relegate even a secured claim to a lower tier, even to the lowest-the equity tier. This appeal centers on when a bankruptcy court may exercise this power based on the debtor’s undercapitalization.
The debtor is Lifschultz Fast Freight Corporation. Its owners ran a shipping business dating from the turn of the century. Their company was Lifschultz Fast Freight, Inc. (LFFI). Its chief enterprise was freight forwarding: consolidating freight from customers and arranging for a shipper to haul it by road or rail. Even' though the Interstate Commerce Commission allowed LFFI in 1985 to join the ranks of the freight carriers, the bulk of the business nonetheless remained in freight forwarding.
The second half of the 1980s was unkind to LFFI. Deregulation had unleashed rapacious competition in trucking, but LFFI stuck to a high-price, high-service track. The company lost hefty sums of money each year, starting at $400,000 in 1985 and rising more or less steadily to $5.5 million in 1989. The insiders decided against liquidating the losing business and instead tried to revive it. The revised business strategy was to focus on running trucks from the West Coast at full capacity. In early March 1990, the insiders set up a new corporation, the future debtor, with $1,000 in cash. Eighty percent of the debtor’s stock was in five pairs of hands— Theodore Cohen, Salvatore Berritto, Anthony Berritto, Sebastian DeMarco and Michael DeMarco. The remaining 20% was LFFI’s. These insiders transferred to the new company all of LFFI’s operations outside New York City (including the customer list), a valuable lease to a California shipping terminal and Dodgers season tickets. The debt- or’s only assumed liability from LFFI was $232,000 of unpaid employee vacation.
As the list of initial assets shows, one thing the debtor lacked was cash — so sorely, in fact, that the debtor was short $91,000 for meeting its first payroll. The solution was the secured loan agreement (the Loan Agreement), dated - March 13, 1990. The-agreement linked the debtor and one of the insiders’ affiliated companies, Salson Express Co., Inc. (Salson Express). By April, Salson Express had lent the debtor $862,841.30. Most of that money the insiders had themselves borrowed from First Fidelity Bank in exchange for personal guarantees from Salvatore Berritto, Sebastian DeMarco and Theodore Cohen. The insiders then lent the money on a secured basis to Salson Express, which lent it in turn to the debtor under the Loan Agreement. On August 10, 1990, the debtor found a fresh $1 million in the form of a factoring agreement from Ambassador Factors. Ambassador Factors required that its security interest superordinate that of the insiders under the Loan Agreement, and also extracted personal guarantees from the insiders. With some of this new money, the debtor paid off all but $300,000 of the insiders’ secured loan at the time of the bankruptcy petition — the $300,000 at issue in this appeal.
The insiders never succeeded in staunching the losses. Administrative expenses ate up the debtor’s operating margins month after month. On revenues that fluctuated monthly between $1.7 million and $2.2 million, the debtor lost an average of $193,000 per month between March and October 1990. Its only monthly profit was in August, for $12,000. An involuntary chapter 11 petition brought the debtor into bankruptcy on November 20, 1990. Prepetition unsecured debt stood at $2.6 million. The trustee operated the business until May 1991, when the debtor proceeded to liquidation under chapter 7.
*343 The insiders filed a claim in bankruptcy court for the remaining $800,000. (More precisely, Salson Express filed, but we refer to Salson Express and the insiders interchangeably, as the parties have stipulated.) In response, the trustee requested that the bankruptcy court equitably subordinate the insiders’ secured interest and transfer the lien to the estate. The debtor had been undercapitalized, the trustee asserted, and therefore the insiders’ claim should be subordinated to the general creditors’.
The bankruptcy court held that the debtor had not been undercapitalized as a matter of fact, but even if the debtor had been, under-capitalization by itself could not justify equitable subordination. To set aside Salson Express’ lien would require that the insiders had been guilty of some other “inequitable conduct.” Finding no other inequitable conduct, the bankruptcy court refused to subordinate the insiders’ secured claim.
The district court saw the law and facts differently. Citing In re Virtual Network Services Corp., 902 F.2d 1246 (7th Cir.1990), the district court said that equitable subordination did not require proof of a creditor’s inequitable conduct (or misconduct; the terms are often used synonymously in the case law). . Undercapitalization alone was enough. Also, finding clear error, the district court concluded that the debtor had been patently undercapitalized. The district court reversed and ordered equitable subordination. The insiders (Salson Express) appeal.
We review the legal conclusions of the bankruptcy court de novo and uphold the bankruptcy court’s factual findings unless clearly erroneous. In re Lefkas Gen. Partners, 112 F.3d 896, 899-900 (7th Cir.1997). If the bankruptcy court’s “account of the evidence is plausible in light of the record viewed in its entirety,” we will not reverse its factual findings even if we “would have weighed the evidence differently.” Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). This same criterion applies to each factual finding of the bankruptcy court, whether or not based on the credibility of witnesses. See id. at 575, 105 S.Ct. at 1512.
The crux of this case is undercapitalization-what the term means, whether it was present in this ease, and if so, what consequences would follow. Undercapitalization is a poorly-defined phrase, and especially so in the context of bankruptcy. An undercapitalized firm is one without enough capital; but that tells us little. We try to define the meaning of “undercapitalization” in this opinion. First we clarify the controlling law. If the debtor was in fact undercapitalized, could undercapitalization alone justify equitable subordination of an insider’s debt claim, absent misconduct by the insider? Absent extraordinary circumstances, we believe that it cannot.
II. Undercapitalization and equitable subordination
The trustee urges that undercapitalization is an independent basis on which a bankruptcy court may wield its power of equitable subordination. To explain why we disagree with this as a prevailing rule, we return to the first principles of equitable subordination to show how the trustee’s rule, if applied generally, would thwart the purpose of the doctrine.
The dominant theme of U.S. bankruptcy law for a business debtor is preservation of the state-law rights of claimants and their relative ordering. 11 U.S.C. §§ 507, 726, 1129; Douglas G. Baird, The Elements of Bankruptcy 15, 71 (rev. ed.1993). A problem can arise if a claimant dresses up a claim she has on the firm as something else of higher priority. Equityholders come last in bankruptcy, which generally means they get nothing at liquidation. To avoid this, an owner might disguise her equity claim as debt. The doctrine of equitable subordination empowers a bankruptcy court to foil this queue-jumping, by reordering the formal rankings of the claimants to restore a just hierarchy.
Equitable subordination typically involves closely-held corporations and their insiders. See Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1356 (7th Cir.1990) (“Equitable subordination usually is a response to efforts by corporate insiders to convert their equity interests into *344 secured debt in anticipation of bankruptcy.”). This is so because elsewhere the suspicion does not easily arise that a claim is anything else but what it purports to be. Take the example of a bank loan. Under current law, banks in this country cannot own significant equity stakes in non-financial companies. The legal distinctions between debt and equity, creditor and owner, are therefore- kept tidy. A loan from a bank is thus presumed to be a loan and the bank a creditor (although if the bank exerts de facto control of the firm, that presumption may be overturned). See id.
A loan from a corporate insider muddles this conceptual clarity. The relationships start to add up: the same person can be an owner of a company, its creditor and, as in the instant ease, its employee as well. So do the opportunities for self-dealing — and self-dealing would violate the insider’s fiduciary duty to the corporation. Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). Suppose that as a firm is listing into insolvency, an insider arranges for the firm to confess a debt for her alleged unpaid salary (as in Pepper), with the idea that she, now a “creditor” and not just an owner, will jump ahead in the queue. The documents supporting the “debt” are unimpeachable, and she has observed all legal niceties. Strict adherence to claimants’ formal rights would allow her ill-gotten gain at the other creditors’ expense, because in liquidation there is rarely enough money left to pay off in full the claimants at the rear.
Equitable subordination allows a bankruptcy court to root out this sort of mischief. An insider is a fiduciary of the corporation.[2] Pepper, 308 U.S. at 306, 60 S.Ct. at 245. If her conduct breached the “rules of fair play and good conscience” vis-a-vis the company and its creditors, the bankruptcy court can send her back to the end of the line. The court will strip her of her debt claim and recharacterize it as what it truly is — equity. Id. at 310-11, 60 S.Ct. at 246-47. Courts subject the dealings of an insider to “rigorous scrutiny” for any such breach. Id. at 306, 60 S.Ct. at 245. Once the trustee has offered “some substantial factual basis to support its allegation of impropriety,” the insider must prove the loan’s good faith and inherent fairness to the corporation. In re Mobile Steel Co., 568 F.2d 692, 701 (5th Cir.1977) (Clark, J.). If the loan cannot meet these exacting standards, the insider will be found to have breached her fiduciary trust, and the loan will be equitably subordinated. Pepper, 308 U.S. at 307, 60 S.Ct. at 245-46.
What general principles guide a court’s use of this power? We turn to the most influential discussion of equitable subordination, the magisterial Mobile Steel. See United States v. Noland, 517 U.S. 535,-, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996) (noting Mobile Steel’s authority); In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1237 (7th Cir.1990) (applying Mobile Steel)-, In re Baker & Getty Fin. Servs., Inc., 974 F.2d 712, 717-18 (6th Cir.1992) (“Most courts have uniformly followed and applied the Mobile Steel test....”). Mobile Steel laid out three conditions a bankruptcy court must find to exist before it equitably subordinates a claim. One, “[t]he claimant must have engaged in some type of inequitable conduct.” Mobile Steel, 563 F.2d at 700. Two, “[t]he misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.” Id. And three, “[ejquitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code].” Id.
Mobile Steel directs us to search for inequitable conduct as the first step. If there is none, then a bankruptcy court cannot subordinate a claim. This insistence on first finding inequitable conduct was the law before codification in 11 U.S.C. § 510(c), and it remained so afterwards. See Noland, 517 U.S. at 537-41, 116 S.Ct. at 1526-27. The creditor must have done something inequitable — a wrong or an unfairness or, at the very least, a masquerade of something for what it is not. In the context of equitable subordina *345 tion, the type of conduct that has been considered “inequitable” generally falls within the following categories: “(1) fraud, illegality, breach of fiduciary duties; (2) undercapitali-zation; and (3) claimant’s use of the debtor as a mere instrumentality or alter ego.” In re Missionary Baptist Found. of America, 712 F.2d 206, 212 (6th Cir.1983) (.Missionary Baptist I); see also Asa S. Herzog & Joel B. Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand. L.Rev. 83, 90 (1961).
The alleged masquerade here is of the insiders’ secured loan to the debtor. The trustee asserts that in truth, the loan was a capital contribution.[3] That the insiders made a secured loan to the company is not wrongful per se, and the trustee does not claim as much. An insider to a company is free to lend money to it, “ ‘provided he does not use his corporate position to defraud creditors or take unfair advantage of them.’ ” Spach v. Bryant, 309 F.2d 886, 889 (5th Cir.1962) (quoting In re Madelaine, Inc., 164 F.2d 419, 420 (2d Cir.1947)).[4] The wrong must stem from the context in which the insiders made the loan. That context, the trustee says, was one of undercapitalization. We ask therefore how a loan (secured or unsecured) to an undercapitalized firm might breach the “rules of fair play and good conscience.” Pepper, 308 U.S. at 310, 60 S.Ct. at 246.
Undercapitalization sounds bad. It may not bear the harsh stigma of words like “fraud” and “deceit,” but courts often seem to use “undercapitalization” as a term of opprobrium. Admittedly, some cases contain language suggesting that undercapitalization is in itself inequitable conduct. For example, some courts have justified equitable subordination by noting the presence of undercapitalization and “other inequitable conduct,” In re Fabricators, 926 F.2d 1458, 1470 (5th Cir.1991) (emphasis added); see also, e.g., In re Herby’s Foods, Inc., 2 F.3d 128, 132 (5th Cir.1993) (“additional inequitable conduct”); cf. In re Lifschultz Fast Freight Corp., 181 B.R. 346, 353 (Bankr.N.D.Ill.1995) (denying subordination in absence of “other inequitable conduct”), rev’d, 191 B.R. 712 (N.D.Ill.1996). While such language may be confusing, it has been established that equitable subordination requires “suspicious, inequitable conduct beyond mere initial undercapital-ization.” In re Branding Iron Steak House, 536 F.2d 299, 302 (9th Cir.1976); see also In re Herby’s Foods, 2 F.3d at 132 (“[UJnderca-pitalization alone generally is insufficient to justify equitable subordination .... however ... the Insiders herein did more.”); In re Fabricators, 926 F.2d at 1469 (dictum); In re Octagon Roofing, 157 B.R. 852, 858 (N.D.Ill.1993); In re Hyperion Enters., 158 B.R. 555, 563 (D.R.I.1993). Because mere undercapi-talization does not, and should not, justify equitable subordination, we think the better view is -that, while undercapitalization may indicate inequitable conduct, undercapitalization is not in itself inequitable conduct.
The source of the tainted connotation of “undercapitalization” is not self-evident. Under any definition, undercapitalization just means that a company does not have enough funds on its balance sheet or in the till. It is a common token of declining business fortune. Every firm in bankruptcy, and many outside, can in some sense be said to be undercapitalized — which is to say, to have insufficient funds on hand. Mobile Steel, 563 F.2d at 703; In re 1236 Development Corp., 188 B.R. 75, 83 (Bankr.D.Mass.1995). Most often undercapitalization signifies nothing more than business failure, poor access to capital, or both. Centuries ago in Western Europe, bankruptcy was deemed “the single *346 most scandalous phenomenon of commercial society,” reviled everywhere as a “ghastly evil.” James Q. Whitman, The Moral Menace of Roman Law and the Making of Commerce: Some Dutch Evidence, 105 Yale L.J. 1841, 1871 (1996). In 16th-century northern Italy, for instance, a debtor seeking discharge would have to “ ‘go naked in a public and notorious place,’ ” like the piazza. Id. at 1873 (quoting Matteo Bruno, Tractatus Mat-thaei Bruni Arimineni de Cessione Bonoru 115[v] (Venice 1561)). There the debtor would have to “ ‘strike[ ] his backside’ ” three times against something called “The Rock of Shame,” while “crying out, T DECLARE BANKRUPTCY.’ ” Id. Today we are a bit more relaxed about the mishaps of businesspeople. The word “bankrupt” may sting in lay language, but American law has jettisoned the idea that business failure and inadequate capital resources are inherently wrongful.
So what is wrong with undercapitalization in itself? The trustee argues that “insufficient capital leads to financing the operation with secured debt, and that exposes unsecured commercial creditors to a greater risk of loss.” Quite so. But again, where is the wrong? Creditors extend credit voluntarily to a debtor. The debtor owes no duties to the creditor beyond those it promises in its contract (and beyond whatever common and statutory law may apply). A debtor decidedly does not owe a fiduciary duty to a creditor. United States v. Jolly, 102 F.3d 46, 48 (2d Cir.1996) (citing Katz v. Oak Indus., Inc., 508 A.2d 873, 879 (Del.Ch.1986)). And a debtor is just as surely not obliged to be the lender’s insurer. A lender will not offer a loan to a borrower unless the rate of return justifies the risk of default or underpayment. The same is true for the sub-class of lenders called trade creditors, for prudent businesspeople assess the risk of default before allowing customers to pay for goods or services on credit. The higher that risk, the more interest (or collateral) the lender will demand. If a firm is poorly capitalized, and thus less likely to repay than a better capitalized firm in the same line of business, the lender may require more security or more interest. But that a highly leveraged company exposes its creditors to serious risks is no new fact of commerce. Creditors are free to lend elsewhere. If they choose to lend to a company that then loses their investment, they cannot go to bankruptcy court and cry misconduct. In re N & D Properties, Inc., 799 F.2d 726, 732-33 (11th Cir.1986) (Clark, J.); In re Octagon Roofing, 157 B.R. at 857-58.
Trickery upsets this logic. Insiders cannot use their superior knowledge of a company to deceive outsiders. Albert Richards Co. v. The Mayfair, 287 Mass. 280, 191 N.E. 430, 434 (1934). If the insider causes the borrowing company to lie to the lender about its financial health — by disguising a pre-existing debt, for instance — the insider is guilty of misconduct. Even the “morals of the market place” forbid deceit. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, C.J.). The debtor’s books must be open and its debts listed there, Spach, 309 F.2d at 889, and it might be (although we do not so hold) that a security interest would have to be perfected (often by filing) to give notice of its existence; see In re Herby’s Foods, 2 F.3d at 132. But if a creditor could have known about an insider’s debt claim on a company, a bankruptcy court will not reward the creditor by lowering the insider’s claim to equity status. In re N & D Properties, 799 F.2d at 732-33. Fairness then is primarily about disclosure. Absent “suspicious, inequitable conduct beyond mere initial undercapitalization,” the creditor’s loss is his own. In re Branding Iron Steak House, 536 F.2d at 302. And while it is true that the burden falls on the insider to prove, the good faith of the loan and its inherent fairness, it is also true that the creditor must first proffer a challenge thereto with “some substantial factual basis to support its allegation of impropriety.” Mobile Steel, 563 F.2d at 701 (citing Pepper, 308 U.S. at 306, 60 S.Ct. at 245). The mere presence of under-capitalization will not suffice.
The presumption of caveat creditor is certainly not absolute. For example, the situation could be different for a creditor who does not have “a meaningful opportunity given [it] to bargain for higher interest rates as compensation for the extreme risk of default.” Robert C. Clark, The Duties of the *347 Corporate Debtor to Its Creditors, 90 Harv. L.Rev. 505, 535-36 (1977). Consumer creditors would also generally fall into a more protected category. Some merchant-creditors might qualify, too. For minor transactions like buying a single office chair on 30-days’ credit, businesspeople as a rule do not haggle over- credit terms. If they did, the burden of inquiry and negotiation would quickly eat up the profits from the deal. Frank H, Easterbrook & Daniel R. Fischel, Limited Liability and the Corporation, 52 U. Chi. L. Rev. 89, 113 (1985). (Tort claimants, of course, typically have no opportunity to bargain at all.) As a general matter, the line is drawn at the point where a reasonably prudent merchant would check out her customer/debtor’s creditworthiness before extending credit. In any particular case, the location of that point is a question of fact for the bankruptcy court’s judgment.
The sense of these principles is shown in the instant case. The trustee objects to the $862,841.30 that the debtor’s insiders supplied to the debtor under the Loan Agreement, or more precisely to the $300,000 secured claim the insiders still had against the company when the bankruptcy petition was filed. But we do not see the injury or inequity in this infusion of working capital. This ease is not an example of the insiders’ converting a pre-existing equity claim into debt. Cf. In re Envirodyne Indus., Inc., 79 F.3d 579, 584 (7th Cir.), cert. denied sub nom. Ryckman v. Envirodyne Indus., Inc., — U.S. -, 117 S,Ct. 77, 136 L.Ed.2d 36 (1996); Kham & Nate’s Shoes, 908 F.2d at 1356; In re Branding Iron Steak House, 536 F.2d at 302. The insiders here contributed fresh working capital. They were under no obligation to do so. Assuming there was no deception, we see no reason to treat an insider’s loan to a company more poorly than that of a third party’s. See Spach, 309 F.2d at 889.
To hold otherwise would “discourage those most interested in a corporation from attempting to salvage it through an infusion of capital.” Mobile Steel, 563 F.2d at 701; see also In re Octagon Roofing, 157 B.R. at 858. Equitable subordination means that a court has chosen to disregard an otherwise legally valid transaction. Mobile Steel, 563 F.2d at 702 (“It is important to remember that the issue is not whether the advances ‘actually’ were loans, but whether equity requires that they be regarded as if they were something else.”). If the court incorrectly disregards a bona fide transaction, it commits a double wrong. First, the court has upset the legitimate expectations of a claimant, which in this case would be Salson Express (the insiders). The second wrong is less visible, but just as significant. Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity. If a court wrongly subordinates a claim, other investors are sure to take heed. An investor will see that the chance she might not get her money back has gone up slightly. She will be less willing to lend or invest in the future; and the cost of credit will rise for all.[5] Kham & Nate’s Shoes, 908 F.2d at 1356-57.
III. “No-fault” equitable subordination
The trustee argues that under our decision in Virtual Network, equitable subordination no longer requires creditor misconduct. Virtual Network upheld the subordination of the IRS’s non-pecuniary loss tax penalty claims to those of other unsecured creditors, even *348 though the IRS had done nothing inequitable.[6] See In re Virtual Network, 902 F.2d at 1250. “Virtual Network extends principles of equitable subordination to a penalty created by operation of law, where delay in collecting the penalty injured other creditors.” Kham & Nate’s Shoes, 908 F.2d at 1356. Other circuits have followed our lead in carving out this exception for tax penalties. See, e.g., In re Burden v. U.S., 917 F.2d 115,116-20 (3d Cir.1990) (subordinating tax penalty in chapter 13 without misconduct); Schultz Broadway Inn v. United States, 912 F.2d 230, 231-34 (8th Cir.1990) (same in chapter 11).[7]
But the trustee mistakes the birth of an exception for the death of a rule. The rule is that equitable subordination is predicated upon creditor misconduct; the exception of Virtual Network is for a class of tardy tax penalties. The reasoning of Virtual Network is based in part on the premise that “Congress meant to give courts some leeway to develop the doctrine” of equitable subordination, Noland, 517 U.S. at 539-41, 116 S.Ct. at 1527, a premise that the Supreme Court may have tepidly endorsed,[8] although apparently without endorsing any particular path of development. But much of Virtual Network’s reasoning is specific to claims for tax penalties, relying on hints in the legislative history that the sponsors of the 1978 Bankruptcy Code revisions considered inequitable conduct to be unnecessary for the subordination of a penalty,[9] see Virtual Network, 902 F.2d at 1248 (citing statements of Representative Edwards as cited by the court below); id. at 1249-50 (endorsing district court’s analysis of legislative history), and the fact that the tax penalty claim did not represent an actual loss, id. at 1250. Virtual Network did not authorize a bankruptcy court to reorder claims in a free-for-all. We need not consider the implications of Noland, if any, for Virtual Network, so we assume the trustee is right to say that after Virtual Network, creditor misconduct is no longer an absolute requirement in this circuit “in all circumstances” and “in every instance.” Virtual Network, 902 F.2d at 1250. That is quite different, however, from saying that creditor misconduct is no longer a requirement in any circumstance or instance, which is incorrect. Cf. In re Baker & Getty Fin. Servs., 974 F.2d at 719 (“Numerous courts have similarly subordinated claims for punitive damages without making a finding of inequitable con-duct_ We ... see no cause to expand a ‘fairness standard’ involving punitive damages to a case such as this one, which involves actual loss claims by all parties.”).
In re Envirodyne Industries, Inc., 79 F.3d 579 (7th Cir.1996), also approved equitable subordination of the claims of innocent credi *349 tors. The creditors were shareholders of a target in a shortform merger who failed to tender their shares to the debtor/acquiror. Their equity interests were converted into non-interest-bearing debt of the debtor. It is true that in Envirodyne, this court explicitly rejected the claimant’s argument that “Virtual Network carved out a limited no-fault exception.” In re Envirodyne Indus., 79 F.3d at 582.
Envirodyne, however, simply establishes another exception to the general rule that equitable subordination requires inequitable conduct. Envirodyne confirms what the reasoning of Virtual Network itself makes clear: tax penalties are not the only possible exception to the general rule. The court in Envi-rodyne concluded that the shareholders’ claims, although formally debt, were in substance “based on equity interests” in the target corporation. Id. at 583. The reasoning of Envirodyne also relies on the fact that, unlike the claims in the present case, the claims in Envirodyne were unsecured,[10] and that the debtor received no assets in exchange for the debt. See id. at 582. In drawing these distinctions, Envirodyne recognizes that inequitable conduct may still be a prerequisite for the equitable subordination of many types of claims.[11] We conclude that inequitable conduct is still the general rule for equitable subordination. The principles discussed in part II, above, suggest that no new exception to that rule is appropriate in this ease.
A bankruptcy court should be doubly wary of using its power of equitable subordination. There unfortunately cannot be perfect predictability for when a court will invoke the doctrine. Equitable subordination relies on courts’ peering behind the veil of formally unimpeachable legal arrangements to detect the economic reality beneath. This task by nature “require[s] the court to make extremely subjective judgments as to whether a party has acted opportunistically.” David A. Skeel, Jr., Markets, Courts, and the Brave New World of Bankruptcy Theory, 1993 Wis. L.Rev. 465, 506 (defending courts’ power of equitable subordination). And easy, clear rules to find underhanded behavior are hard to come by, because the clever soon figure out ways around them. What courts can try to do, however, is to mark off territory where there is generally no justification for equitable subordination. We attempt to do so here: un-dercapitalization alone, without evidence of deception about the debtor’s financial condition or other misconduct, cannot justify equitable subordination of an insider’s debt claim. Extraordinary circumstances might provide an exception, see Pepper, 308 U.S. at 309-11, 60 S.Ct. at 246-47, but we believe that almost any such exception would arguably also involve other misconduct of some sort. In-this case, the bankruptcy court did not recognize any extraordinary circumstances, and so without trying to be definitive as to every future contingency, we think that mere undercapitalization — if it exists in the present case — is not grounds for equitable subordination.
IV. The debtor and undercapitalization
A. Undercapitalization considered
But was the debtor here even under-capitalized? The insiders say no, and the bankruptcy judge agreed. The district court reversed. Undercapitalization is a question of fact, and we review the bankruptcy court’s judgment for clear error. Before we can assess the debtor’s undercapitalization, however, we must first confront the threshold *350 issue óf what undercapitalization denotes as a matter of law.
There really are two questions: what to measure, and how to measure it. The kind of capital a court is measuring has various names — shareholder equity, paid-in capital or equity capital — but whatever it is called, it means the excess of total assets over total liabilities. This is the kind of capital to which Pepper directed our attention, 308 U.S. at 309, 60 S.Ct. at 246, and it is the kind that Mobile Steel had in mind. Mobile Steel, 563 F.2d at 703. It is also the kind of capital upon which the Code predicates its definition of insolvency. See 11 U.S.C. § 101(32). Shareholder equity differs from other measures of capital that accountants and lawyers might use, such as a firm’s total assets or the moribund concept of legal or stated capital (as in “par value”). William P. Hackney & Tracey G. Benson, Shareholder Liability for Inadequate Capital, 43 U. Pitt. L.Rev. 837, 890 (1982). It is “the cushion of protection afforded to creditors-net assets, or the total contribution made by the shareholders.” Id.
Shareholder equity should also be (but is not always) distinguished from working capital. Working capital is that portion of a firm’s assets that are in relatively liquid form — the current assets such as cash, accounts receivable and inventory. Net working capital is the excess of current assets over current liabilities; it measures the ability of a firm to pay its debts as they mature. Working capital thus means something quite different from equity capital. The distinction is neatly shown with a balance sheet and the accounting identity A=L + NW (assets = liabilities plus net worth, or equity capital). Working capital refers to a kind of asset that the firm holds; it shows up as an entry on the left-hand side of the balance sheet. Equity capital, on the other hand, refers to a kind of claim against the assets of the firm, the owners’ stake, and is entered on the right-hand side. The other kind of claim against the firm’s assets is debt (or liability); and once all the liabilities of a firm have been set off against its assets (and assuming there are still some assets left),, the residuum is equity capital. A common transaction involves a firm’s using its equity capital as a basis for acquiring working capital-as in the case before us.
Equitable subordination centers on sorting out the true nature of a claim against a firm. Thus it is the amount of equity capital, not working capital, that is the subject of our inquiry. In re Multiponics, Inc., 622 F.2d 709, 717 n. 8 (5th Cir.1980); Costello v. Fazio, 256 F.2d 903, 907 (9th Cir.1958). Take an example illustrating this distinction. Suppose a firm was set up with plenty of cash, more than enough to meet its current liabilities. Suppose also that the firm was encumbered from the start with non-current or long-term liabilities that dwarfed the firm’s ability to repay them but that had yet to come due. That firm might have sufficient working capital, or liquidity; but it would also have zero equity capital, i.e., its liabilities would exceed its assets and its shares would be worthless. The firm would be undercapi-talized from inception, no matter the adequacy of its initial working capital.
Equity and working capital are certainly not so cleanly separated in the daily workings of commerce. A shortage of working capital is often the mark of undercapitalization (i.e., inadequate equity capital). Take the case of a firm falling into arrears. By definition we know that the firm has too little working capital: it is failing to meet its current liabilities as they come due. Often the undérlying reason will be inadequate equity capital. Whether a shortage of working capital actually does reveal undercapitalization turns on why the firm is in arrears. One possibility is that the firm does have enough assets to cover its debts, but cannot free them up just now. Perhaps the firm owns a new office building, the value of which could cover all the firm’s liabilities, but which may take years to sell at a good price. In that instance, the firm’s equity capital is more than sufficient; the deficiency is solely in working capital. A mortgage, backed by the building, might be the answer. If a firm cannot procure such a loan, a second possibility comes to the fore: the firm lacks enough equity capital (total assets minus total liabilities) to justify a creditor’s lending it money. In that second possibility, a shortage of *351 working capital would reveal a deficiency of equity capital, that is, undercapitalization. The point is that a shortage of working capital is neither a sufficient nor a necessary condition for undercapitalization. As noted above, a firm could have a surfeit of working capital and still be undercapitalized. And, conversely, if a firm lacks working capital, a court cannot automatically conclude that it is undercapitalized as well.
The case at bar illustrates these principles at least twice. The trustee points to the debtor’s being almost cashless at inception as proof of undercapitalization. This does, not necessarily follow: sometimes a dearth of working capital only suggests illiquidity. If the firm has no working capital but then raises sufficient liquid funds by borrowing against its illiquid assets, the firm is not undercapitalized. The bankruptcy court found that precisely this conversion of illiquid assets into liquid assets occurred in this case. The debtor obtained sufficient working capital by pledging its assets under the Loan Agreement. (That the loan was from the insiders is a matter we discuss below.) The trustee makes a similarly flawed objection to counting toward capitalization two assets the debtor held at inception: the bargain lease to a California shipping terminal and Dodgers tickets. Neither constitutes working capital, the trustee rightly says, for the assets are illiquid. Yet that observation determines nothing, because the trustee is measuring the wrong kind of capital. The tickets were sold during liquidation for $47,000, the lease for $292,500. Both represent hard value that the equityholders lost and the unsecured creditors gained in bankruptcy. They both should have been counted as contributions to equity capital.
How much equity capital is enough? There is no litmus test to sort firms into two neat piles, the adequately and inadequately capitalized. Numerous authorities have cautioned us not to be dogmatic or mechanical in assessing the adequacy of capital. As Judge Clark put it:
Absolute measures of capital inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation’s balance sheets and financial statements, are of little utility, for the significance of this data depends in large part upon the nature of the business and other circumstances.
Mobile Steel, 563 F.2d at 702-03. Instead a rule of reason governs. A firm is adequately capitalized for purposes of equitable subordination if its equity capital equals or exceeds “what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.” Mobile Steel, 563 F.2d at 703 (citing N. Lattin, The Law of Corporations §§ 15, 77 (1971)).
To put this rule of reason into practical form, the approach finding the most favor is the two-pronged test enunciated in Mobile Steel. This test takes its cue from observable, formal changes in the firm’s capital structure. The first prong looks to the moment of initial capitalization of the firm. Undercapitalization exists at inception “if, in the opinion of a skilled financial analyst, [the capitalization] would definitely be insufficient to support a business of the size and nature of the [debtor] in light of the circumstances existing at the time the bankrupt was capitalized.” Mobile Steel, 563 F.2d at 703. The second prong looks to the time of the insider’s loan, which may or may not be after inception. Undercapitalization at the time of the loan exists if the debtor “could not have borrowed a similar amount of money from an informed outside source.” Id. If the debtor could have raised the funds elsewhere on similar or better terms, the inference would be that a third party thought that the' firm had enough equity capital and was, in light of that fact and others, creditworthy. One can therefore safely conclude that such a firm is not undercapitalized. If the firm could not have borrowed elsewhere, however, the firm was undercapitalized at the time of the insider’s loan.
The two-prong test avoids a tempting diagnostic error. When a business goes sour for whatever reason, its capitalization will necessarily suffer. Perhaps every firm that slips into insolvency can be termed un- *352 dercapitalized. Testing by hindsight will thus turn up too many false positive results of undercapitalization. In re 1286 Development Corp., 188 B.R. at 83. But see In re Multiponics, 622 F.2d at 717. Owners owe no duty to recapitalize a failing firm, and courts should not introduce one through the back door by retrospectively finding undercapitalization by proof of “eventual failure.” Mobile Steel, 563 F.2d at 703; Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co., 855 F.2d 406, 416 (7th Cir.1988). The Mobile Steel test prevents this error by directing a court’s attention to what the owners could have reasonably known at a particular time. If the founders set up a clearly undercapital-ized firm from the start, a court may with confidence find undercapitalization without risk of Monday morning quarterbacking. (We leave aside the possibility that the owners could subsequently cure their paltry initial contributions of equity capital, an uncommon event in undercapitalization cases. We also do not consider here the more typical cases of the owners’ withdrawing equity capital as the business founders, or their transmogrifying an extant equity claim into a higher-tier claim.) And if, under prong two, the firm at the time the insiders advanced the debt could not have raised working capital elsewhere by leveraging its equity capital, that too is firm ground on which a court may find undercapitalization. In re Herby’s Foods, 2 F.3d at 129-30, 132 (finding under-capitalization where no third-party was willing to lend).
Either prong would suffice by itself. What if thé prongs conflict? Concrete evidence based on the business judgment of merchants or bankers, we think, ought to triumph over the necessarily post-hoc conjectures of judges. If the insiders can show convincingly that a firm could have got a loan elsewhere, the arm’s-length prong should defeat a finding of initial undercapitalization. The finding at inception may be wrong, rooted as it must be in guesses and estimates; and even if the initial finding is right, later profits may have healed the foundational defect by boosting the value of the equity stakes.
B. Was the debtor undercapitalized?
When it comes to whether the debt- or here was undercapitalized, the parties roughly agree upon the facts. Their interpretation fuels the dispute. The insiders and the trustee have struggled now in three courts over prong one of Mobile Steel, the debtor’s initial capitalization. The parties cannot agree on how much equity capital the firm had at the start, much less whether it was enough. The trustee contends the debt- or started operations with an initial capitalization of negative $131,013, which certainly sounds like undercapitalization; the insiders say the correct figure is over $1 million.[12] And even if they could agree on a number, they would still dispute how much equity capital a firm like the debtor ought to have had.
There is a less complicated way to resolve the debtor’s putative undercapitalization: Mobile Steel’s second prong, the arm’s-length test. At the time the insiders made the loan, *353 we ask, would the debtor have been able to borrow a similar amount of money on comparable terms from an. informed outside source? In this case, we need not speculate about what might have happened. We know what did happen. The debtor not only could have gotten a third-party loan, it actually did — from Ambassador Factors. The Ambassador Factors loan for $1 million came in August 1990, after the insiders’ loan and with several financially gloomy months in' between. Ambassador Factors was an informed outside source: its relationship with LFFI began well before the launching of the debtor. The insiders prudently had set the terms of their loan to match or beat those that Ambassador Factors had required from LFFI on an' earlier occasion (before the debtor’s creation). And like the insiders, it lent the money to the debtor on a secured basis (the insiders agreed to subordinate their secured interest to the loan from Ambassador Factors).
So far the two loans look indistinguishable. No, the trustee says: Ambassador Factors demanded a personal guarantee from several of the insiders, and that proves undercapitali-zation. Not so. Undercapitalization is a possible rationale for a lender’s requiring a personal guarantee from the insider of a closely-held corporation, but it is far from the only one. The insiders control their own salary and the issuance of dividends. These two powers naturally make a lender wary that the insiders will siphon needed funds out of the company. A personal guarantee averts that risk. A personal guarantee also can align the entrepreneur’s incentives more closely with the outside lender’s by shifting risk of default back to the entrepreneur. And for a particularly risky enterprise, a lender may not wish to be saddled with the whole risk of business failure. (An example would be a bank’s giving a recourse loan to a real estate developer: even if the bank gets a mortgage on the property, it may still require the ability to go after the developer if the project flops.) Which among these rationales or perhaps still others motivated Ambassador Factors, we do not know. At no time did the trustee offer evidence showing that undercapitalization even played a role in Ambassador Factor’s demand for personal guarantees. Given the absence of factual proof, accepting the trustee’s logic would amount to ruling that a personal guarantee denotes undercapitalization as a matter of law. That would be incorrect, and we do not so rule.
The two loans, however, would not be eomparable-and the inference of adequate capitalization would be undermined — if Ambassador Factors had restricted the insiders’ ability to pay off the older Salson Express loan with the new loan from Ambassador Factors. Had Ambassador Factors insisted on a condition like that, we could infer that Ambassador Factors was relying on the insiders’ keeping the funds within the debtor so that a lender could rely on not just the solvency of the company, but of the owner as well. But Ambassador Factors did not; and the bankruptcy court did not err in likening the two loans to one another.
The law only asks of insiders that “under all the circumstances the transaction carries the earmarks of an arm’s length bargain.” Pepper, 308 U.S. at 306-07, 60 S.Ct. at 245-46. It does not ask more. In this case, the insiders provided funds to the company on a footing comparable to that an outsider afforded. This conclusion supports the second prong of the Mobile Steel test, and thus the bankruptcy court’s finding of adequate capitalization. On the matter of undercapitalization, we find no clear error and so reach a different conclusion on this point than the district court.
V. Final issues
We are almost — but not quite— done. The trustee has advanced two final grounds for justifying equitable subordination of Salson Express’ claim. The first is that the insiders (specifically, Salvatore Berritto and Sebastian DeMarco) wronged the debtor by causing it to pay off $200,000 of the Salson loan in November 1990, just before the involuntary petition. The insiders then used that money to pay off their personal bank loans to First Fidelity. This withdrawal, the trustee says, is creditor misconduct. The bankruptcy judge rejected the trustee’s argument, arguing that the with *354 drawal reduced the debtor’s outstanding balance on the Saison Express loan, and thus conferred a benefit on the debtor. That’s true; but as the district court noted in reversing the bankruptcy court, the benefit of reducing the balance was relatively trivial, and the debtor’s need for funds great. The district court’s conclusion would be more compelling, however, if the Saison Express loan were treated as equity capital and not a loan. Yet we have upheld the bankruptcy court’s treatment of it as a loan and of Saison Express as a secured creditor. A consequence of respecting the insiders’ choice of debt to contribute funds is that the insiders’ withdrawal of those funds should be viewed on the same terms. A creditor is not obliged to forebear from calling its loan just because the debtor would find those funds useful. And in any case, no one has even argued that “a shortage of capital funds contributed to [the debtor’s] financial demise,” Mobile Steel, 563 F.2d at 703. Bankruptcy law empowers trustees with potent tools to avoid insiders’ last-minute attempts to strip a debtor of capital. See, e.g., 11 U.S.C. §§ 547 (preferences), 548 (fraudulent transfers). We are not inclined to create a superfluous mechanism that would posit that insider creditors are not “real” creditors.
On the second ground, we aré far less sanguine about the insiders’ conduct. In the bankruptcy court, the trustee pointed to a set of salary raises for insiders during the spring and summer of 1990. The bankruptcy judge decided the raises did not show creditor misconduct, and the district court expressed no opinion on the question (having already found independent grounds for equitable subordination).
The rationale for equitable subordination stems from the multiplicity of relationships that insiders may have with a firm. The insiders may own the firm, lend it money and, in the case of this debtor, work for it as employees. As we said above, one classic form of creditor misconduct is boosting the owner-employee’s salary as the firm is drifting into financial collapse. Pepper, 308 U.S. at 306, 60 S.Ct. at 245. The possibility of such misconduct inheres in the multiplicity of relationships, for in a closely-held firm, “it is obvious that salaries must be fixed by the persons receiving them.” Spach, 309 F.2d at 889. But just because the possibility is unavoidable does not make taking advantage of it right. If an insider did commit such salary-inflating misconduct in this case, the salary inflation could justify equitably subordinating the (unrelated) secured claim of Saison Express. Any misconduct by an insider may be invoked to subordinate a particular claim of that insider, “irrespective of whether it was related to the acquisition or assertion of that claim.” Mobile Steel, 563 F.2d at 700.
In the spring of 1990, the debtor’s directors increased Theodore Cohen’s salary from $75,000 to $125,000. Then, during the summer, the directors retroactively raised it to $130,000 a year. Also during the summer, the directors raised Michael DeMarco’s initial salary retroactively from $73,000 to $130,000, and Anthony Berritto’s from $31,-000 to $55,000. The bankruptcy judge termed these instances of “questionable business judgment.” We certainly agree. We would go further: the trustee, we think, has raised a “substantial factual basis” suggesting improper conduct through retroactive raises by and for the benefit of the insiders. See Mobile Steel, 563 F.2d at 701. The burden of proof therefore shifts to the insiders to show the inherent fairness and good faith of the transactions.
The evidence in the record is sketchy. The insiders, the trustee and both judges concentrated on the question of undercapital-ization, and left the evidence (and arguments) about the salary raises underdeveloped. The salaries apparently reflected real, not Active work; Cohen swore that he worked 70 to 100 hours a week as the debt- or’s chief executive, trying to turn the debtor around. Maybe the board of directors increased the salaries because Cohen, DeMar-co and Berritto were Stakhanovite laborers. Maybe not. (It’s also not obvious that overtime work by executives of a failing business justifies higher salaries.) In any event, the burden of evidence falls on the insiders, and if they fail to rebut, the court must presume misconduct. The bankruptcy court did not reach this question, as it thought the salary *355 raises not so troubling as to flip the burden of persuasion to the insiders. We think otherwise; and from what little we can glean, the insiders did not rebut the allegation in the bankruptcy court. On such a piecemeal basis, however, we are not prepared to prejudge the question. We accordingly remand the case to the bankruptcy court to determine whether the insiders met (or can meet) their burden of rebuttal; we leave to the discretion of the bankruptcy court whether to hear additional evidence. If the insiders meet their burden of rebuttal, no portion of their claim should be equitably subordinated. And if the insiders fail, we leave it to the bankruptcy court’s discretion to determine, depending on the insider’s evidence, whether to equitably subordinate some or all of the insiders’ claim, consistent with the principles of Mobile Steel, 568 F.2d at 700-02. The parties shall bear their own costs of this appeal.
REVERSED and RemaNded for further proceedings not inconsistent with this opinion.

. Although in certain circumstances a loan could be recharacterized as a capital contribution for tax purposes. See, e.g., Motel Co. v. Commissioner, 340 F.2d 445 (2d Cir.1965).

. We do not consider whether "one can be an insider without being a fiduciary,” In re Missionary Baptist Found. of America, 818 F.2d 1135, 1144 (5th Cir.1987) (Missionary Baptist II), since neither party has raised the distinction — presumably because it is clear that as controlling stockholders the insiders here are fiduciaries, see Pepper, 308 U.S. at 306, 60 S.Ct. at 245.

. As a technical matter, the appellee defends the judgment below only on the basis that equitable subordination is proper, not that the insiders’ claim should be recast as equity. Cf. In re Hyperion Enters., 158 B.R. 555, 560 (D.R.I.1993) ("[T]he issues of recharacterization of debt as equity capital and equitable subordination should be treated separately.”).

. Not everyone agrees that insiders ought to be able to lend to their own companies. The criticism is that current law- encourages the waste of scarce resources, because it permits already-failed businesspeople to flush good money after bad. See Leonard J. Long, Automatic Subordination as Incentive for Insider Creditors’ Prudential Investing, 13 J.L. & Com. 97, 99 (1993). A counterargument would be that insiders are best positioned (both in terms of knowledge and of incentives) to dispose wisely of their capital. Of course, whether the criticism has any merit is a matter for Congress, not the judiciary.

. Recent bankruptcy scholarship has highlighted these ex ante effects of bankruptcy law — that is, "moving backward in time, how the law influences the parties’ incentives to invest.” Alan Schwartz, The Absolute Priority Rule and the Firm’s Investment Policy, 72 Wash. U. L.Q. 1213, 1213 (1994). See also Susan Rose-Ackerman, Risk Taking and Ruin: Bankruptcy and Investment Choice, 20 J. Legal Stud. 277 (1991); David A. Skeel, Jr., Markets, Courts, and the Brave New World of Bankruptcy Theory, 1993 Wis. L.Rev. 465. This scholarship reiterates a theme of Adam Smith's. "When the law does not enforce the performance of contracts, it puts all borrowers nearly upon the same footing with bankrupts or people of doubtful credit in better regulated countries. The uncertainty of recovering his money makes the lender exact the same usurious interest which is usually required from bankrupts.” Adam Smith, The Wealth of Nations, Bk. I, Chap. IX, para. 14 (1776). See also Scott M. Browning, No Fault Equitable Subordination: Reassuring Investors That Only Government Penalty Claims Are at Risk, 34 Wm. & Mary L.Rev. 487, 524 (1993).

. In Virtual Network, the bankruptcy court rejected the debtor-in-possession's request to subordinate the Internal Revenue Service’s tax penalty claims, but the district court reversed. In re Virtual Network, 902 F.2d at 1247.

. The Supreme Court recently reversed two cases in which bankruptcy courts equitably subordinated federal tax penalties. See United States v. Noland, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996), rev’g 48 F.3d 210 (6th Cir.1995); United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), rev’g 53 F.3d 1155 (10th Cir.1995). The Supreme Court unanimously held that the bankruptcy court's exercise of its power of equitable subordination must not have the "inevitable result” of equitably subordinating "every tax penalty.” Noland, 517 U.S. at 539-43, 116 S.Ct. at 1527-28; see also Reorganized CF & I Fabricators, 518 U.S. at --, 116 S.Ct. at 2115; id. (Thomas, J., concurring in part and dissenting in part). The appellee, suggests that these Supreme Court rulings "ratify” the approach of Virtual Network, Appellee Br. at 13-14; the appellant contends that the Supreme Court held that "creditor misconduct was necessary to equitably subordinate the respective creditor claimfs] in each case.” Appellant Reply Br. at 6. Neither party's characterization of the holdings of these cases is accurate: the Supreme Court found it unnecessary to "decide ... whether a bankruptcy court must always find creditor misconduct before a claim must be equitably subordinated.” Noland, 517 U.S. at 541-43, 116 S.Ct. at 1528.

. According to the Court, the existence of such leeway is "almost as clear” as the proposition that " 'principles of equitable subordination’ may allow a bankruptcy court to reorder a tax penalty in a given case.” Noland, 517 U.S. at 543, 116 S.Ct. at 1527.

. In Noland, the Supreme Court suggests that the sponsors of the Bankruptcy Code incorrectly characterized the existing law with respect to subordination of penalties. See Noland, 517 U.S. at 541-43, 116 S.Ct. at 1528.

. The fact that the claims in Envirodyne were unsecured does dispose of the appellant's contention that Envirodyne holds that inequitable conduct is required for the equitable subordination of any secured claim. Also without merit is the appellee’s contention that Noland and Reorganized CF & I Fabricators establish that any distinction Envirodyne might have made between secured and unsecured claims must now be irrelevant: in neither Noland nor Reorganized CF & I Fabricators did the Supreme Court address the role of inequitable conduct in equitable subordination.

. We are aware of no case in which this circuit has approved the equitable subordination of a secured claim absent inequitable conduct, although In re Vitreous Steel Products Co., 911 F.2d 1223, 1237 (7th Cir.1990), does appear to leave open the possibility that we would approve equitable subordination in such a case.

. For those curious about this wide divergence, the trustee says the debtor started business with an initial $1,000 in cash, plus $100,987 in depreciated property and equipment. The trustee would assign no value to LFFI’s customer list, the Dodgers tickets and the lease to the California shipping terminal. Set against the accrued liability for unpaid vacation time for employees ($232,000), the trustee's figures yield an initial capitalization of negative $131,013. The insiders, on the other hand, would assign a value of $47,000 and $292,500 to the tickets'and the lease respectively on the (correct) ground that illiquid assets count toward equity capital just as much as liquid ones.
The issue of the customer list is more difficult. The trustee says that a customer list should be valued as a multiple of profits. Because the firm was losing money, the customer list was supposedly worthless. The trustee’s valuation method might make sense if the business were being transferred or sold whole. Here, though, only LFFI's customer list was transferred to the debt- or. A better way to value the list would be as a percentage of gross earnings. Kimball Laundry Co. v. United States, 338 U.S. 1, 19 & n. 12, 69 S.Ct. 1434, 1444 & n. 12, 93 L.Ed. 1765 (1949). The fact is that the debtor’s list was generating $22 million a year in revenue. Even if the debt- or could not make money with it, maybe somebody else could. The debtor’s customers were a premium bunch: all were willing to pay high prices for good service, and the list manifested that information. The precise value of the list is shrouded in an evidentiary tussle, one that we need not resolve for this appeal.